## McMILLAN, A/K/A OLUGBALA *v.* STATE OF MARYLAND

[No. 289, September Term, 1969.]

*Decided May 11, 1970.*

148

The cause was argued before HAMMOND, C. J., and BARNES, FINAN, SMITH and DIGGES, JJ.

*Larry S. Gibson,* with whom were *Brown, Allen & Josey* on the brief, for appellant.

*T. Joseph Touhey, Assistant Attorney General,* with whom were *Francis B. Burch, Attorney General, Edward F. Borgerding, Assistant Attorney General, Charles E. Moylan, Jr., State's Attorney,* and *Michael E. Kaminkow, Assistant State's Attorney,* on the brief, for appellee.

FINAN, J., delivered the opinion of the Court. BARNES, J., concurs in the result. Concurring opinion at page 155 *infra.*

It is said that Charles I, King of England (1600-1649),

refused to remove his hat before Parliament and, literally speaking, lost his head. On September 17, 1969, Olugbala-Olugbala, also known as Benjamin McMillan, refused to remove his headgear (filaas) while being arraigned before the Criminal Court of Baltimore, Carter, J., presiding and was sentenced to jail for contempt of court. With Charles I, it was a matter of sovereignty; with Olugbala, it would appear to be a matter of religion. For the reasons which we hereinafter set forth, we reverse the judgment of the lower court.

Olugbala was in court for the purpose of being arraigned on various related charges of riot. At the commencement of the proceedings the court requested him to remove his head cover. He responded by asserting that his head cover, known as a filaas, had religious significance and that it would be contrary to his religious practices and beliefs to remove it. The court repeated its request. Counsel for Olugbala explained that several judges in other courts has allowed him to wear his head cover out of deference to his religious beliefs and without incident. Whereupon the court again repeated its request. Olugbala requested that the court allow him to confer with his counsel, which request was granted. Counsel then asked permission to approach the bench, which permission was denied. This request was apparently for the purpose of discussing a proffer whereby the defendant would outline what he proposed to prove as to the nature of his religious beliefs and their relationship to his wearing of the filaas. In any event, Olugbala now contends that he was given no opportunity to explain the nature of his religious beliefs and the sanctions they imposed on him with regard to the wearing of the filaas. Nor did the court question him on the nature of these beliefs and their connection with his wearing of the filaas. The following colloquy then took place between the court and counsel for the defendant:

> Counsel: "We have a situation; an individual on more than one occasion has been detained in institutions and these institutions have also rec-

ognized his religious beliefs as they relate to head covering and have permitted this or recognized this. This is a special situation and have permitted Mr. Olugbala to keep his hat on. This man came before the State Human Relations Commission, and we have documentation of that case, and they also recognized we had a special situation and prevailed upon the Department of Correction in this matter, and I would strongly prevail upon Your Honor, this is not an individual who is wearing a hat out of contempt of court, but wearing it in recognition of religious belief very much the same as a yarmulka to a Jew."

The Court: "If a Jew were in here with a yarmulka on, he would remove it."

Counsel: "Even the police officer is wearing a hat as part of their uniform. This man is wearing it as part of his religious belief."

The Court: "In this Court he will remove his hat. Sorry, I don't agree with you. I am in charge of this Court and he will remove it."

\* \* \*

The Court: "\* \* \* I am not hard to get along with, but this is one rule that has got to be followed, and he has to follow it the same as anybody else. I am not going to wait much longer. He will remove it or he will be found in contempt."

Counsel: "The defendant has informed his attorney that his religious beliefs are compelling and overwhelming and because of these beliefs he will not remove his hat, etc."

The Court: "Very well, I find him in contempt and confine him until such time as he purges himself. That will be when he comes back in and removes his hat. \* \* \*."

From this citation the defendant appealed. The defen-

dant has been released on bail pending the outcome of this appeal.

We are of the opinion that the trial judge erred in citing the defendant for contempt and the judgment of the lower court should be reversed. The record reveals that what the defendant endeavored to do, although inartfully, was to make proffer of the nature of his religious beliefs and their relationship to his refusal to uncover his head. We think, however, that the transcript makes it clear that even if the defendant had made a proper proffer as to his religious beliefs and the duty they imposed upon him to wear his filaas, and had testified to this, the resulting action of the court citing him for contempt would have been the same. The court held the defendant in contempt without knowledge of the denomination of his religion, its origin, general tenets, organization or the length of time he had espoused it.

The Free Exercise Clause of the First Amendment of the United States Constitution and Article 36 of the Declaration of Rights of the Constitution of Maryland give extensive protection to religious liberty.[1] This includes not only protection to assure the practice of universally known and conventionally accepted religions but a myriad of seldom heard of, off-brand and off-beat religious concepts. See *Abington School Dist. v. Schempp and Murray v. Curlett,* 374 U. S. 203 (1963) ; *Engel v. Vitale,* 370 U. S. 421, 435 (1962) ; *Torcaso v. Watkins,* 367 U. S. 488 (1961) ; *McGowan v. State of Maryland,* 366 U. S. 420 (1961) ; *West Virginia State Board of Education v. Barnette,* 319 U. S. 624 (1943) ; *Cantwell v. Connecticut,* 310 U. S. 296, 303 (1940) ; *Schowgurow v. State,* 240 Md. 121, 124, 213 A. 2d 475 (1965) ; *Craig v. State,* 220 Md. 590, 155 A. 2d 684 (1959) ; *Dobkin v. District of Columbia,* 194 A. 2d 657 (D.C. Ct. App., 1963).

---

1. It is no longer seriously disputed that the First Amendment of the United States Constitution is applicable to the states through the Fourteenth Amendment. Cantwell v. Connecticut, 310 U. S. 296, 89 L. Ed. 1213, 60 S. Ct. 900 (1940), 128 A.L.R. 1352. Md. and Va. Eldership v. Sharpsburg, 249 Md. 650, 241 A. 2d 691 (1968).

Indeed in *Cantwell,* Mr. Justice Roberts tersely stated, "* * * [T]he Amendment [First] embraces two concepts—freedom to believe and freedom to act. The first is absolute but, in the nature of things, the second cannot be." 310 U. S. at 304.

Accordingly, the State may abridge the religious practices of any individual only upon a demonstration that some compelling state interest outweighs the interest of the individual in his religious tenets. *Sherbert v. Verner,* 374 U. S. 398 (1963); *Braunfeld v. Brown,* 366 U. S. 599 (1961); and *Thomas v. Collins,* 323 U. S. 516 (1945). This last case involved a cognate right under the Free Exercise Clause, freedom of speech.

We are fully aware that the orderly administration of courts of justice requires the maintenance of dignity and decorum and for that reason rules of conduct and behavior to govern participants are essential. *Ex parte Bowles,* 164 Md. 318, 165 A. 169 (1933). Understandably, respect for the courts is something in which the State has a compelling interest. However, in the instant case it would appear that the wearing of the filaas by the defendant was not disruptive of the decorum and respect to which a court is entitled. This is substantiated by the fact that at a habeas corpus proceeding held before Judge Grady, and instituted by the defendant after his citation for contempt, he was permitted to wear the filaas without any apparent disruption of the proceedings or attendant lack of respect to the court. It is important to note that in *Sherbert, supra,* the Court emphasized that those situations wherein the Court has permitted restrictions on the practice of religious beliefs were situations wherein the practices or beliefs "have invariably imposed some substantial threat to public safety, peace or order." 374 U. S. at 403. See also *Reynolds v. United States,* 98 U. S. 145 (1878), wherein the Supreme Court upheld a polygamy conviction of a member of the Morman faith, whose religion sought to impose upon its male members a duty to practice polygamy. See also *Prince v. Massachusetts,* 321 U. S. 158 (1944); *Cleveland*

*v. United States*, 329 U. S. 14 (1946) ; and *Craig v. State*, 220 Md. 590, 155 A. 2d 684 (1959).

It must be understood that although freedom of religion is a sacred right protected by the First Amendment, the courts are not to be put upon by a defendant insinuating into a serious matter, such as court proceedings, some frivolous custom or farcical gimmick under the guise of a religious practice. This is one of the reasons why we think the court erred in not accepting the defendant's offer to explain the nature of his religious beliefs and their relation to his head cover.

While the courts may not weigh the verities of religious beliefs, as Judge Barnes said in *Md. & Va. Eldership v. Sharpsburg*, 249 Md. 650, 661, 241 A. 2d 691 (1968), "* * * [T]he courts, wisely we think, will not enter a 'theological thicket,' " nevertheless, they may inquire as to whether the defendant is sincere and bona fide in his harboring of the belief. The Supreme Court of the United States in *United States v. Ballard*, 322 U. S. 78 (1944), stated: "Men may believe what they cannot prove. They may not be put to the proof of their religious doctrines of belief." However, the Court implied that inquiry may be made into whether a defendant held his belief honestly and in good faith, or whether he sought to wear it as a mantle to cloak his illegal activities and bring them under the umbrella of protection afforded by the First Amendment. See also *Dobkin v. District of Columbia*, 194 A. 2d 657 (D.C. Ct. App., 1963), wherein a defendant, an attorney, of the Hebrew faith refused to appear in court claiming prejudice because his trial was scheduled on Friday afternoon after the beginning of the Jewish Sabbath. The court stated that it would normally have accommodated the defendant regarding the practice of his religion but, as it turned out, he had gone to his office to work that day, not to a synagogue, so his claim was specious.

Prior to the argument before this Court, the State, on March 25, 1970, filed a Motion for Correction of Omission in the Record and on the strength of Maryland Rule

P3 c 4, sought to have included in the record the transcript of the testimony of a habeas corpus hearing held before Judge Grady, in the Criminal Court of Baltimore, on September 19, 1969. This habeas corpus hearing which was initiated by the defendant on his incarceration for contempt was held on the same day as, but subsequent to, the arraignment proceedings at which the defendant was found guilty of contempt. The appellant raised no objections to the inclusion of the transcript of this testimony in the record and at the time of the argument on appeal in this Court the motion was left open for ruling. We do not think that the transcript of the testimony given at the habeas corpus proceedings can properly be considered a part of the record of the arraignment out of which the citation for contempt arose. We think the testimony given at the habeas corpus proceeding can have no legal significance, insofar as the contempt citation is concerned. However, since the appellant has raised no objection we grant the appellee's motion to include this transcript in the record and we have considered it for informative purposes only.

At the habeas corpus hearing the defendant stated under oath that he was a member of a religious sect known as Ujamma, which apparently had its origin in Tanzania, Africa. The defendant characterized it as a religion based on social, economic and political, and religious beliefs. He stated that he had been a member of the faith for two years. He further testified that his religion compelled him to wear his filaas before any of his oppressors and that he felt the white people of this country were oppressing the black people and that the court was his oppressor, and therefore he was compelled by his religious belief to keep his head covered even if, as a consequence, he had to go to the gas chamber. He stated that he believed God to be nature and that "nature let the sun shine just as hard on me as it do on anybody else * * *." As we have already emphasized, the courts cannot weigh the theological merits of a religious belief. Prior to citing the defendant for contempt, had the trial judge made in-

quiry as to the circumstances surrounding the defendant's conversion and his espousal of his beliefs, he may have found his allegiances to these tenets to be insincere or not bona fide. However, on the basis of the record we have no right to assume this.

If indeed, the defendant is sincere and acting in good faith in his belief that he must keep his head covered while in court, we find the words of Mr. Justice Douglas, in his concurring opinion in *Sherbert, supra,* most pertinent: "The case we have for decision seems to me to be of small dimension, though profoundly important." 374 U. S. at 410.

*Order reversed, appellee to pay costs.*

BARNES, J., concurring:

I concur in the result, but I would confine the decision to the application of Article 36 of the Declaration of Rights of the Constitution of Maryland in regard to religious freedom. The majority correctly observes that the Supreme Court of the United States in *Cantwell v. Connecticut,* 310 U. S. 296, 60 S. Ct. 900, 84 L. Ed. 1213, 128 A.L.R. 1352 (1940) did indeed impose the provisions of the First Amendment of the Federal Constitution in regard to the free exercise of religion on the States allegedly under the due process clause of the Fourteenth Amendment. The States, under the Supremacy Clause in the Federal Constitution and this State under Article 2 of the Declaration of Rights of the Maryland Constitution are obligated to recognize and apply this decision by the Supreme Court of the United States; and we have done this in *Md. and Va. Eldership v. Sharpsburg,* 249 Md. 650, 241 A. 2d 691 (1968). I have heretofore expressed my opinion that the decision in *Cantwell v. Connecticut* and its rather formidable progeny was in error and opened a Pandora's Box of impositions of Federal judicial power upon the States with most unfortunate consequences. I have also heretofore explained in part, at least, the reasons for my opinion that selected portions of

the first eight amendments to the Federal Constitution are not properly held applicable to the States through the Due Process Clause of the Fourteenth Amendment (that clause itself being one portion only of the Fifth Amendment) and need not repeat those reasons here. See *Brukiewa v. Police Commissioner of Baltimore City,* 257 Md. 36, 78, 263 A. 2d 222, 231 (1970) ; *State v. Giles,* 245 Md. 342, 660-669, 229 A. 2d 97-102 (1967) ; *Truitt v. Board of Public Works,* 243 Md. 375, 411, 221 A. 2d 370, 392 (1966) ; *State v. Barger,* 242 Md. 616, 628, 639-644, 220 A. 2d 304, 311, 317-319 (1966) ; *Montgomery County Council v. Garrott,* 243 Md. 634, 650, 653, 222 A. 2d 164, 172, 176 (1966) ; and *Hughes v. Maryland Committee for Fair Representation,* 241 Md. 471, 491-513, 217 A. 2d 273, 285-298 (1966).

I merely wish to note that I have in no way changed my opinion in regard to what I believe to be a most unfortunate error by the Supreme Court. Indeed, as the unhappy results of this error unfold, my opinion in this regard is the more confirmed.

I have also, with deference, suggested that the error be remedied by the Supreme Court's return to more orthodox constitutional doctrine. Failing this, the second remedy might well be by Congressional action under either Article III, Clause 2 of the Federal Constitution or under Section 5 of the Fourteenth Amendment, itself. See *Brukiewa v. Police Commissioner of Baltimore City, supra,* 257 Md. at 78, 263 A. 2d at 231.

In my opinion, the public interest earnestly requires that the error be remedied. I hope that the remedy will soon come to pass.