386 A.2d 1112.

IN RE ROBERT MARION PALMER.

JUNE 1, 1978.

PRESENT: Bevilacqua, C.J., Joslin, Kelleher, Doris and Weisberger, JJ.

BEVILACQUA, C.J.   We issued a writ of certiorari in this case to review the record of a Superior Court proceeding during which the petitioner, who avows to be an orthodox Sunni Muslim, claims that his right to free exercise of religion, as guaranteed by the state and federal constitutions, was violated.

The petitioner originally had petitioned the Probate Court of the City of Providence to allow him to change his name for religious reasons from Robert Marion Palmer to Mujahid Musa Abdul-Hakim. This petition was denied and Palmer appealed that decision to the Superior Court.

On the day of the scheduled hearing before the Superior Court, petitioner was seated in the courtroom waiting for his case to be called. The trial justice, noticing that petitioner was wearing a white, knitted skullcap, asked petitioner if he

was wearing a hat. The petitioner responded that he was wearing a prayer cap. The trial justice then stated that he did not allow men to wear hats, caps, or head covers of any kind while present in his courtroom. The petitioner contends that the trial justice requested that petitioner either remove the skullcap or leave the courtroom. The petitioner alleges that he attempted to explain that the cap was a takia, a prayer cap which covers the top of the head and is a religious symbol among Sunni Muslims indicating that its wearer is in constant prayer, and that his religious beliefs prevented him from removing the takia. The petitioner then left the courtroom without removing the prayer cap.

A conference was held in chambers, during which the trial justice apparently suggested to counsel for petitioner that if petitioner did not wish to remove his skullcap, his deposition could be offered in lieu of oral testimony. The case was called for a hearing, at which time petitioner was still absent from the courtroom. The petitioner's attorney reasserted that religious beliefs precluded petitioner from removing the takia in court and asked that petitioner be permitted to stay in the courtroom and testify while wearing his prayer cap. Finally, upon motion by petitioner's attorney, the trial justice passed the case. The petitioner then sought a writ of certiorari to review the record of the proceedings before the Superior Court. We issued the writ because of the importance of the issue raised and the likelihood of its reoccurrence.

The petitioner contends that he was denied rights secured by the free exercise clause of the first amendment to the United States Constitution and by article I, section 3 of the Rhode Island Constitution[1] when he was requested by the judge to remove his skullcap while in the courtroom. Although petitioner and his counsel made several abortive

---

[1]We will only address the federal constitutional issue in this case. As we point out in this opinion, the free exercise clause of the first amendment has been held by the United States Supreme Court in *Cantwell* v. *Connecticut*, 310 U.S. 296, 60 S. Ct. 900, 84 L. Ed. 1213 (1940), to apply to the states via the fourteenth amendment. Under the supremacy clause of the federal constitution we are bound to apply this

efforts to explain the nature and sincerity of the religious beliefs expressed by petitioner in the wearing of the symbolic prayer cap, the trial justice did not attempt to discover whether these beliefs were sincerely held or whether they precluded petitioner from removing his takia in court. We believe that in failing to do so the trial justice unjustifiably infringed upon the religious freedoms granted to petitioner and to all citizens by the free exercise clause of the first amendment.

The free exercise clause of the first amendment, which was made applicable to the states by virtue of the fourteenth amendment, *Cantwell* v. *Connecticut*, 310 U.S. 296, 60 S. Ct. 900, 84 L. Ed. 1213 (1940), provides that "Congress shall make no law respecting an establishment of religion, *or prohibiting the free exercise thereof * * * .*" (Emphasis added.) Freedom of religion has been declared a "fundamental right," *West Virginia State Board of Education* v. *Barnette*, 319 U.S. 624, 638, 63 S. Ct. 1178, 1185-86, 87 L. Ed. 1628, 1638 (1943), and occupies a "preferred position" in the constitutional hierarchy. *Follett* v. *Town of McCormick*, 321 U.S. 573, 575, 64 S. Ct. 717, 718, 88 L. Ed. 938, 940 (1944), *citing Murdock* v. *Pennsylvania*, 319 U.S. 105, 115, 63 S. Ct. 870, 876, 87 L. Ed. 1292, 1300 (1943).

Despite the exalted status so rightly afforded to religious beliefs and activities that are motivated by and embody those beliefs, the freedom of an individual to practice his religion does not enjoy absolute immunity from infringement by the state. Individuals have been subject to mandatory innoculations despite religious objections to such medical care. *Jacobson* v. *Massachusetts*, 197 U.S. 11, 25 S. Ct. 358, 49 L. Ed. 643 (1905). Members of the Mormon faith, which at one time encouraged male adherents to practice poly-

doctrine and to be guided by the Supreme Court's decisions explicating the free exercise clause. Additionally, we have held in *Bowerman* v. *O'Connor*, 104 R.I. 519, 247 A.2d 82 (1968), that the language of article I, section 3 of the Rhode Island Constitution is no more restrictive as to religious freedoms than the language of the Federal Constitution.

gamy, have been subject to conviction for polygamy notwithstanding their objection that they are exempted from such laws by virtue of the free exercise clause. *Cleveland* v. *United States*, 329 U.S. 14, 67 S. Ct. 13, 91 L. Ed. 12 (1946); *Reynolds* v. *United States*, 98 U.S. 145, 25 L. Ed. 244 (1878). Jehovah's Witnesses have been convicted for violating child labor laws by permitting their children to sell religious pamphlets, even though members of that faith dedicate their lives to disseminating their religious beliefs by such methods. *Prince* v. *Massachusetts*, 321 U.S. 158, 64 S. Ct. 438, 88 L. Ed. 645 (1944). Thus while the freedom to hold religious beliefs and opinions is absolute, the freedom to act in harmony with these religious beliefs and opinions is not beyond state regulation where such restriction serves the public interest by promoting public health and safety or preserving order. We must then accommodate the right to exercise the religious freedoms safeguarded by the first amendment with the right of the state to regulate these individual freedoms for the sake of societal interests. The problem is one of balance and degree — the courts are called upon to determine when the societal interest becomes so important as to justify an incursion by the state into religious activity that is otherwise protected by the free exercise clause of the first amendment.

A trilogy of free-exercise cases decided by the United States Supreme Court has employed and further refined the balancing process. In *Braunfeld* v. *Brown*, 366 U.S. 599, 81 S. Ct. 1144, 6 L. Ed. 2d 563 (1961), the Court upheld the constitutionality of a Sunday closing law in the face of a challenge by Jewish merchants who contended that compelling them to close their shops on Sunday effectively forced them to choose between maintaining their businesses or observing the Jewish Sabbath. The Court found that the statute did not violate the merchants' right to free exercise of religion because it furthered a valid secular goal by providing a day of rest for the citizenry, imposed only an indirect burden on religious observance, and could not realize its purpose by any alternative, less burdensome means. *Id.* at 607, 81 S. Ct. at 1148, 6 L. Ed. 2d at 568.

In *Sherbert* v. *Verner*, 374 U.S. 398, 83 S. Ct. 1790, 10 L. Ed. 2d 965 (1963), the Court proposed the analytical framework that is utilized now in free-exercise cases. When an individual shows that the state has interfered with an action of a sincere, religious nature, then the state must establish that there was a compelling state interest in the regulation and that such an interest could not be promoted by a less restrictive means. *Id.* at 406-07, 83 S. Ct. at 1795-96, 10 L. Ed. 2d at 972.

The most recent application of this analytical framework by the United States Supreme Court occurred in *Wisconsin* v. *Yoder*, 406 U.S. 205, 92 S. Ct. 1526, 32 L. Ed. 2d 15 (1972), where the Court struck down a compulsory education statute as it applied to certain Amish children. Applying the balancing test developed in *Sherbert* the Court found that although the state had a substantial interest in insuring some minimum level of education for its citizens, such an interest was not sufficient to override the interest of an Amish parent in segregating his children from formal public education beyond the eighth grade where such an interest was a sincere religious expression of the Amish belief that separation from contemporary society during the formative adolescent years is essential to spiritual salvation. *Wisconsin* v. *Yoder*, 406 U.S. at 234-36, 92 S. Ct. at 1542-43, 32 L. Ed. 2d at 36-37.

In the case at bar, petitioner's act of wearing the takia in the courtroom was interfered with when the trial justice made it clear that petitioner would not be allowed to wear the prayer cap in court. Under the *Sherbert* test, petitioner would have to establish that the activity in question was sincerely religious in nature. The record reveals that both petitioner and his attorney offered to explain the sincerity and religiousity of the beliefs that related to the wearing of the takia, but were forestalled from presenting a full explanation by the trial justice. We believe that because petitioner claimed that his act was protected by the free exercise clause, in order to justifiably curtail the exercise of that alleged right the trial justice should first have allowed petitioner to display

the sincerity of his religious belief, and then should have applied the second prong of the *Sherbert* test by balancing petitioner's first amendment right with the interest of the court in maintaining decorum in its proceedings by regulating dress in the courtroom. Only such a careful, systematic balancing of rights will insure the protections guaranteed by the first amendment and comply with the mandate of the United States Supreme Court in *Sherbert* v. *Verner,* 374 U.S. 398, 83 S. Ct. 1790, 10 L. Ed. 2d 965.

Under very similar facts, the court in *McMillan* v. *State,* 258 Md. 147, 265 A.2d 453 (1970), applied the *Sherbert* analysis to reverse the criminal conviction of a defendant who refused to remove a prayer cap in court because the trial judge did not first inquire into the nature and sincerity of the religious beliefs which compelled the defendant to wear the prayer cap despite the judge's warnings. We agree with the holding of *McMillan.*

We realize that we are not called upon here to reverse a contempt conviction, as in *McMillan,* nor are we called upon to remand the case to allow petitioner to show the sincerity of his beliefs. But we do wish to make it clear that if petitioner or any other individual in the exercise of sincere religious beliefs allegedly affronts the dignity of a court by virtue of his physical appearance, then that person is entitled to show the court that he is sincere and bona fide in his belief.

We agree that courts have an interest in maintaining dignity and decorum by establishing various rules to govern the conduct of participants. *McMillan* v. *State,* 258 Md. 147, 265 A.2d 453; *LaRocca* v. *Lane,* 47 A.D. 2d 243, 366 N.Y.S. 2d 456, *aff'd,* 37 N.Y.2d 575, 338 N.E.2d 606, 376 N.Y.S.2d 93 (1975), *cert. denied,* 424 U.S. 968, 96 S. Ct. 1464, 47 L. Ed. 2d 734 (1976). However, the rule of *Sherbert* is that restrictions on religious practices are permissible only where the practices threaten public safety, peace, or order. We do not believe that wearing a prayer cap in court threatens these benchmarks enumerated in *Sherbert.* Thus assuming that the

petitioner's beliefs are sincere, the state would bear a heavy burden of establishing how such actions threaten any compelling interest that the state may have in maintaining decorum in the courtroom.

The petition for certiorari is granted and the record certified to us is remanded to the Superior Court with our decision endorsed thereon.

*Barry Kusinitz,* Rhode Island Legal Services, Inc., for petitioner.

*Julius C. Michaelson,* Attorney General, *Nancy Marks Rahmes,* Special Assistant Attorney General, as amicus curiae.