580 A.2d 196

**Timothy MITCHELL**

v.

**STATE of Maryland.**

**No. 115, Sept. Term, 1989.**

Court of Appeals of Maryland.

Oct. 9, 1990.

Nancy S. Forster, Asst. Public Defender and George E. Burns, Jr., Asst. Public Defender (Alan H. Murrell, Public Defender, all on brief), Baltimore, for petitioner.

Richard B. Rosenblatt, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., both on brief), Baltimore, for respondent.

Argued before MURPHY, C.J., and ELDRIDGE, COLE, RODOWSKY, McAULIFFE, ADKINS * and CHASANOW, JJ.

McAULIFFE, Judge.

Having just been sentenced, and while still standing at the trial table, Timothy Mitchell gave vent to his displeasure by directing a contumelious single-finger gesture at the trial judge. The judge summarily found Mitchell in direct contempt, and sentenced him to an additional term of imprisonment. Mitchell seeks reversal, contending that he was denied due process of law because a summary proceeding was employed, and because the judge who was the object of the insulting gesture conducted the proceeding.

## I.

On 29 July 1987, in Baltimore City, Leo O'Rourke was robbed and murdered. Three days later, the Georgia state police stopped Mitchell and Robert Kroening in a vehicle that contained some of the property which had been stolen from O'Rourke. Kroening admitted having been present when O'Rourke was murdered, but said that Mitchell was

---

* Adkins, J., now retired, participated in the hearing and conference of this case while an active member of this Court; after being recalled pursuant to the Constitution, Article IV, Section 3A, he also participated in the decision.

the killer. Kroening ultimately entered into a plea agreement with the State. He agreed to plead guilty to felony murder and to testify against Mitchell, and in return to receive a sentence of life imprisonment with all except 30 years suspended.

Mitchell was indicted for murder, armed robbery, felony theft, and related charges. He was tried before a jury in the Circuit Court for Baltimore City, with Judge Robert I.H. Hammerman presiding. Although Kroening testified that Mitchell had killed O'Rourke, the jury found Mitchell not guilty of all charges except felony theft. At sentencing, it was revealed that Mitchell had an extensive and serious criminal record, and had escaped from a Maryland prison on the day of the murder. Judge Hammerman sentenced Mitchell to 15 years imprisonment—the maximum sentence for felony theft. At one point, when Judge Hammerman began to explain that the sentence he had imposed would be consecutive to another sentence Mitchell was then serving, Mitchell said, "save your speech." The judge lightly admonished the defendant, and continued with his explanation. Defendant's counsel then advised his client of various post-judgment rights that he had. The record indicates that the following then occurred:

DEFENDANT'S ATTORNEY: Thank you, Your Honor.

THE COURT: That will conclude the hearing.

(Pause.)

THE COURT: Let the record show that I've asked [defendant's attorney] to come back and stand next to the defendant at trial table. I want the record to show that when the defendant was handcuffed and shackled by the three prison guards and they finished the process and were beginning to lead him out of the courtroom, but still standing at the trial table, he turned around 360 degrees [sic] to face me, looked right at me, raised his hands and raised the middle finger right at me and pointed to me in a familiar gesture that is well-known to be a vulgar and obscene gesture and it was saying something. When one

does that, one is speaking to the person he does it to and it is no different than if one says those words audibly. One is giving a message and saying something vulgar and crude to the individual to whom he is directing that gesture and as I have said, the defendant turned completely around, looked right at me, raised his arms in handcuffs and made that gesture and I was looking right at him. I find him in criminal contempt of court. I am imposing a sentence of five years on the defendant for this contempt. This sentence is to run consecutively to the sentence I have imposed on him today. You may take him away.

DEFENDANT'S ATTORNEY: May I be excused, Your Honor?

THE COURT: Yes, sir.

(Proceedings concluded.)

Sixteen days later, Judge Hammerman modified the contempt sentence, reducing it to five months and 29 days.[1] At the same time, he entered an order reciting the facts of the contempt and the disposition. *See* Maryland Rule P3. The order of contempt closely tracks the description of events that Judge Hammerman originally dictated into the record, with the following addition:

The defendant had previously shown his hostility to the court during the sentencing proceeding. When I ordered the defendant to be unhandcuffed and pointed out the contempt that I had seen and what it was, the defendant at no time suggested that he had done anything different than what the court had seen.

Mitchell appealed his conviction of criminal contempt as well as his conviction of felony theft. The Court of Special Appeals affirmed both convictions in an unreported opinion.

---

1. A sentence for a single criminal contempt cannot exceed six months imprisonment unless the defendant has been given a jury trial or has waived that right. *Taylor v. Hayes,* 418 U.S. 488, 495, 94 S.Ct. 2697, 2701, 41 L.Ed.2d 897 (1974); *Wilkins v. State,* 293 Md. 335, 338–40, 444 A.2d 445 (1982).

We granted Mitchell's petition for certiorari, which presents the single question of whether the trial judge erred in summarily adjudging the defendant in contempt.

## II.

Mitchell does not suggest that the conduct attributed to him by Judge Hammerman did not constitute a direct contempt of court. Rather, he argues that under the circumstances of this case it was error to utilize a summary procedure against him. He contends that: 1) the proceeding involving him had concluded and thus there was no need to resort to summary contempt proceedings, and 2) because the trial judge was the target of the insult, he should have disqualified himself.

Criminal contempt is a crime in every fundamental respect. *Bloom v. Illinois,* 391 U.S. 194, 201, 88 S.Ct. 1477, 20 L.Ed.2d 522 (1968). Accordingly, the Due Process Clause of the Fourteenth Amendment will ordinarily require that a person charged with criminal contempt be given certain fundamental rights available to a defendant in any other criminal case, including notice of the charge, an opportunity to be heard in defense, the right to counsel, and the right to a jury trial in a serious case. *See Young v. U.S. ex rel. Vuitton et Fils S.A.,* 481 U.S. 787, 799, 107 S.Ct. 2124, 2133, 95 L.Ed.2d 740 (1987); *Taylor v. Hayes,* 418 U.S. 488, 498–500, 94 S.Ct. 2697, 2703–04, 41 L.Ed.2d 897 (1974); *Groppi v. Leslie,* 404 U.S. 496, 502–03, 92 S.Ct. 582, 586, 30 L.Ed.2d 632 (1972); *Bloom v. Illinois, supra,* 391 U.S. at 207–08, 88 S.Ct. at 1485; *In re Oliver,* 333 U.S. 257, 273, 68 S.Ct. 499, 507, 92 L.Ed. 682 (1948). *See also State v. Roll and Scholl,* 267 Md. 714, 730–31, 298 A.2d 867 (1973). A long-established exception exists, however, in the case of direct contempt.

> [I]t is a settled doctrine in the jurisprudence both of England and of this country, never supposed to be in conflict with the liberty of the citizen, that for direct contempts committed in the face of the court, at least one

of superior jurisdiction, the offender may, in its discretion, be instantly apprehended and immediately imprisoned, without trial or issue, and without other proof than its actual knowledge of what occurred; and that, according to an unbroken chain of authorities, reaching back to the earliest times, such power, although arbitrary in its nature and liable to abuse, is absolutely essential to the protection of the courts in the discharge of their functions.

*Ex parte Terry*, 128 U.S. 289, 313, 9 S.Ct. 77, 83, 32 L.Ed. 405 (1888).

Maryland recognizes this exception. Maryland Rule P3(a) provides that "[a] direct contempt may be punished summarily by the court against which the contempt was committed." *And see State v. Roll and Scholl, supra*, 267 Md. at 731, 298 A.2d 867. A direct contempt is defined by Maryland Rule P1(a) as "a contempt committed in the presence of the court, or so near to the court as to interrupt its proceedings."

■ While conceding that, on occasion, there may be a necessity to scale back ordinary due process rights in favor of prompt and effective action necessary to address a disruption that threatens the proceedings, Mitchell contends this was not such an occasion. He argues that the proceedings involving him had terminated, and no new proceedings had begun, so that his conduct could not have had the effect of interfering with any proceedings or with the orderly administration of justice.

Mitchell's view of the proper function of summary contempt proceedings in the maintenance of dignity, decorum, and order in the courtroom is myopic. The courts must, and do, have the power to deal promptly and decisively with blatantly contemptuous conduct of the type that occurred here. As the Supreme Court said in *Illinois v. Allen*, 397 U.S. 337, 343, 90 S.Ct. 1057, 1061, 25 L.Ed.2d 353 (1970):

It is essential to the proper administration of criminal justice that dignity, order, and decorum be the hallmarks of all court proceedings in our country.

The flagrant disregard in the courtroom of elementary standards of proper conduct should not and cannot be tolerated.

In order to constitute a direct contempt, it is not necessary that the conduct bring to a halt the proceedings in progress. It takes but a moment of time to hurl a vile epithet at a judge or jury, but such conduct in a courtroom will not be tolerated, and may properly be addressed summarily. Speaking of the "need for immediate penal vindication of the dignity of the court," the Supreme Court has said:

[U]nless such an open threat to the orderly procedure of the court and such a flagrant defiance of the person and presence of the judge before the public in the 'very hallowed place of justice,' as Blackstone has it, is not instantly suppressed and punished, demoralization of the court's authority will follow.

*Cooke v. United States*, 267 U.S. 517, 536, 45 S.Ct. 390, 394–95, 69 L.Ed. 767 (1925). The Supreme Court has made clear that it is neither necessary nor desirable that the trial judge remain passive until matters degenerate to the point where proceedings cannot be held. Rather, prompt action may be taken to preserve order.

To preserve order in the court room for the proper conduct of business, the court must act instantly to suppress disturbance or violence or physical obstruction or disrespect to the court when occurring in open court. There is no need of evidence or assistance of counsel before punishment, because the court has seen the offense. Such summary vindication of the court's dignity and authority is necessary. It has always been so in the courts of the common law and the punishment imposed is due process of law.

267 U.S. at 534, 45 S.Ct. at 394. What we said recently, in a slightly different context, in discussing the damaging ef-

fects of epithets directed toward attorneys or judges in a courtroom, bears repeating here.

> [C]onduct of this kind is prejudicial to the administration of justice. That such conduct does not at the moment of its occurrence delay the proceedings or cause a miscarriage of justice in the matter being tried is not the test. Conduct of this type breeds disrespect for the courts and for the legal profession. Dignity, decorum, and respect are essential ingredients in the proper conduct of a courtroom, and therefore in the proper administration of justice.

*Attorney Griev. Comm'n v. Alison,* 317 Md. 523, 536, 565 A.2d 660 (1989). *See generally* Annot., *Attorney's Addressing Allegedly Insulting Remarks to Court During Course of Trial as Contempt,* 68 A.L.R.3d 273 (1976).

Mitchell's assertion that his conduct did not occur in the course of judicial proceedings is wrong. Court proceedings did not end with the last words necessary to complete Mitchell's sentencing. Court remained in session. The judge remained on the bench. Judicial proceedings were in progress.

Mitchell relies heavily upon the precedent of *Mayberry v. Pennsylvania,* 400 U.S. 455, 91 S.Ct. 499, 27 L.Ed.2d 532 (1971), but that reliance is misplaced. In *Mayberry,* the defendant represented himself, and on a number of occasions throughout a protracted trial he reviled the judge by calling him a "dirty sonofabitch," "dirty tyrannical old dog," "stumbling dog," and "fool." *Id.* at 466, 91 S.Ct. at 505. At a separate sentencing proceeding following the defendant's conviction, the trial judge announced he was holding the defendant in contempt for each of 11 described instances of this type of conduct, and he immediately imposed sentence for each occurrence. The Supreme Court reversed the contempt convictions, holding that where the trial judge elected to defer action addressing contemptuous acts which vilified the judge, the trial judge should have asked another judge to take his place for the purpose of adjudicating the charges of contempt.

The single most important fact that distinguishes *Mayberry* from the case before us is that in *Mayberry* the trial judge deferred action on the contempt. Because of that delay, the Supreme Court reasoned, there was no necessity for the trial judge to hear and determine the allegation of contempt, but there were significant reasons why he should not. What Mitchell apparently overlooks in *Mayberry* is the clear statement of the Supreme Court that the trial judge "could, with propriety, have instantly acted, holding petitioner in contempt. . . ." *Id.* at 463, 91 S.Ct. at 504.

Mitchell also reads *Mayberry,* and the later case of *Taylor v. Hayes, supra,* 418 U.S. at 488, 94 S.Ct. at 2698, to suggest that a trial judge may be precluded from utilizing summary contempt procedures when the nature of the contempt was conduct directed toward him that has personally embroiled him with the defendant. We do not read *Mayberry* or *Taylor* to so hold. In each case, disposition of the contempt charges was postponed to the end of the trial. As Justice Douglas pointed out for the Court in *Mayberry,* 400 U.S. at 463–64, 91 S.Ct. at 504, the difference between that procedure and summary contempt proceedings is significant:

> [W]e do not say that the more vicious the attack on the judge the less qualified he is to act. A judge cannot be driven out of a case. Where, however, he does not act the instant the contempt is committed, but waits until the end of the trial, on balance, it is generally wise where the marks of the unseemly conduct have left personal stings to ask a fellow judge to take his place.

To the same effect, *see Sacher v. United States,* 343 U.S. 1, 12, 72 S.Ct. 451, 456, 96 L.Ed. 717 (1952). Judge Hammerman acted immediately to hold Mitchell in contempt for this action. This option was available to the trial judge, and in adopting it he was entitled to proceed summarily.

### III.

■ The final issue concerns the procedure that should be followed by the trial judge when summarily punishing

for direct contempt. From the transcript, it would appear that the defendant was not given an opportunity to explain or deny the conduct observed by the judge, or to speak to the matter of an appropriate sanction, before adjudication was made and sentence pronounced.[2]

Under prior case law, there is no doubt that this procedure would have survived any claim of denial of due process. The question of what process is due under particular circumstances is, however, always open for review. In this very area of the law, the Supreme Court has had no hesitancy in re-examining and revising established law where it was satisfied that consideration of necessity and efficiency no longer justified excepting criminal contempt cases from certain constitutional protections guaranteed in other criminal proceedings. *Bloom v. Illinois, supra,* 391 U.S. at 207–08, 88 S.Ct. at 1485 (previous law denying jury trials in contempt cases overruled as to all serious contempts). The due process protections of "reasonable notice of a charge ..., and an opportunity to be heard" have been characterized as "basic in our system of jurisprudence." *In re Oliver, supra,* 333 U.S. at 273, 68 S.Ct. at 507. The Supreme Court has pointed out that when at least a brief opportunity is afforded for a response, a defendant may be able to offer a defense, or "present matters in mitigation, or otherwise attempt to make amends with the court." *Taylor v. Hayes, supra,* 418 U.S. at 499, 94 S.Ct. at 2703. The American Bar Association Standing Committee on Associa-

---

**2.** Although the transcript does not indicate that the defendant was afforded an opportunity to deny or explain his conduct, we recognize that it is sometimes difficult to reconstruct pauses or nonverbal communications from a cold record. In the order which he filed in this case, Judge Hammerman indicated that he had ordered the defendant to be freed from handcuffs and that "the defendant at no time suggested that he had done anything different than what the court had seen." The record indicates that at the conclusion of the judge's statement concerning the contempt, the defense attorney spoke, but only to ask if he could be excused. Maryland Rule P3(c)(2) provides that the defendant may file an affidavit, which will constitute a part of the record in a direct contempt proceeding. Mitchell did not file an affidavit in this case.

tion Standards for Criminal Justice has recommended the following standard in all criminal contempt cases:

> Before imposing any punishment for criminal contempt, the judge should give the offender notice of the charges and at least a summary opportunity to adduce evidence or argument relevant to guilt or punishment.

American Bar Association, ABA Standards for Criminal Justice, Special Functions of the Trial Judge § 6–4.4, p. 53 (1972, 1986 Supp.). In its commentary to that section, the Committee said:

> Although there is authority that in-court contempts can be punished without notice of charges or an opportunity to be heard, [*Ex parte Terry*, 128 U.S. 289, 9 S.Ct. 77, 32 L.Ed. 405 (1888) ] such a procedure has little to commend it, is inconsistent with the basic notions of fairness, and is likely to bring disrespect on the court. Accordingly, notice and at least a brief opportunity to be heard should be afforded as a matter of course. Nothing in this standard, however, implies that a plenary trial of contempt charges is required.

The Supreme Court has also noted that "[e]ven where summary punishment for contempt is imposed during trial, 'the contemnor has normally been given an opportunity to speak in his own behalf in the nature of a right of allocution.'" *Taylor v. Hayes, supra*, 418 U.S. at 498, 94 S.Ct. at 2703, quoting *Groppi v. Leslie, supra*, 404 U.S. at 504, 92 S.Ct. at 587. The Maryland Trial Judges Bench Book (1977, 1988 rev.) suggests at § 3–506(c)(2)(H) that in summary contempt proceedings the trial judge should afford the alleged contemnor a brief opportunity to speak before passing sentence. Professor Richard B. Kuhns, in *The Summary Contempt Power: A Critique and a New Perspective*, 88 Yale L.J. 39, 57 (1978), suggests that more recent Supreme Court cases may have undermined the holding of *In re Terry, supra*, which denied the right of allocution in summary contempt cases.

We have recognized that in some cases of direct contempt, the contemnor must be given an opportunity to

speak. *See, e.g., McMillan v. State,* 258 Md. 147, 153, 265 A.2d 453 (1970) (error to adjudge defendant in direct contempt for refusal to remove his headgear in court without first affording him an opportunity to justify his conduct on religious grounds); *and cf. Kandel v. State,* 252 Md. 668, 672, 250 A.2d 853 (1969) (attorney held in direct contempt for being late to court was not denied due process where record disclosed he was given the opportunity to present exculpatory reasons for his tardiness).

We are not, however, persuaded that due process requires that an alleged contemnor must, in every instance, be given an opportunity to respond before an adjudication of direct criminal contempt is made in a summary proceeding. In some cases, affording a defendant an opportunity to speak in explanation of his conduct may only invite additional invective. Furthermore, where the conduct or speech is as direct or unequivocal as it was in the case before us, there may be little or no room for helpful explanation.

On the other hand, a person whose inappropriate conduct was essentially reflexive, when confronted with the seriousness of what he or she has done, may quickly become contrite and effectively communicate an appropriate apology. Indeed, the explanation offered, or the sincerity with which it is offered, may persuade the trial judge to strike the finding of contempt. If not, allocution by the alleged contemnor will at least assist the judge in fixing the appropriate sanctions.

The nonconstitutional "right" of allocution before the imposition of punishment in a criminal case has a long and interesting history. As Judge Thompson pointed out for the Court of Special Appeals in *Brown v. State,* 11 Md.App. 27, 30, 272 A.2d 659 (1971), the common law rule required the judge to call upon the accused personally, before sentencing, "to show cause why sentence should not be im-

posed."[3] Maryland originally employed a modified version of the common law rule, recommending allocution in all cases punishable by death or imprisonment in the penitentiary by requiring a showing of prejudice before any remedy for noncompliance was available. *Id.* at 31, 272 A.2d 659. In 1962, the Maryland Rules of Practice and Procedure were amended to require that a defendant be afforded the right of allocution in criminal cases. *Id.* Currently, Rule 4–342(e) requires that before the imposition of sentence, "the court shall afford the defendant the opportunity, personally and through counsel, to make a statement and to present information in mitigation of punishment."[4] Our cases make clear the importance of the right of allocution. *See, e.g., Shifflett v. State,* 315 Md. 382, 386–87, 554 A.2d 814 (1989); *Harris v. State,* 312 Md. 225, 254, 539 A.2d 637 (1988); *Harris v. State,* 306 Md. 344, 356, 509 A.2d 120 (1986); *Booth v. State,* 306 Md. 172, 199, 507 A.2d 1098 (1986).

We conclude that under the circumstances of this case, as a matter of Maryland nonconstitutional criminal law, the trial judge should have afforded Mitchell at least a brief opportunity for allocution before imposing sentence. Not only would this have afforded the defendant an opportunity to offer an explanation or an apology which may have affected the judge's final determination, but it would also promote the appearance of justice. *See Shifflett v. State, supra,* 315 Md. at 387, 554 A.2d 814. Although the circumstances of this case justify the utilization of a summary proceeding, they do not suggest an exigency sufficient to dispense with this brief, but important, procedure. The failure of the trial judge in this case to afford the alleged contemnor a brief opportunity for allocution before the

---

**3.** There is some dispute concerning the applicability of the common law rule to noncapital cases. *Brown v. State,* 11 Md.App. at 31, 272 A.2d 659.

**4.** A counterpart rule applicable in capital cases, is very similar in content. *See* Rule 4–343(d).

imposition of sentence requires that we vacate the judgment of contempt and remand the case for further proceedings.

JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED IN PART AND REVERSED IN PART; CASE REMANDED TO THAT COURT WITH INSTRUCTIONS TO VACATE THE JUDGMENT FOR CONTEMPT AND TO REMAND THE CASE TO THE CIRCUIT COURT FOR BALTIMORE CITY FOR FURTHER PROCEEDINGS NOT INCONSISTENT WITH THIS OPINION; COSTS IN THE COURT OF SPECIAL APPEALS TO BE DIVIDED EQUALLY BETWEEN THE PETITIONER AND THE MAYOR AND CITY COUNCIL OF BALTIMORE; COSTS IN THIS COURT TO BE PAID BY THE MAYOR AND CITY COUNCIL OF BALTIMORE.

ADKINS, Judge, dissenting.

Although I agree with the majority that Timothy Mitchell should have been allowed to allocute before he was sentenced for criminal contempt of court, I am, nevertheless constrained to dissent. I believe that under the circumstances of this case the judge who was the object of Mitchell's contemptuous gesture should not have conducted the summary contempt proceeding.

After a jury in the Circuit Court for Baltimore City found Mitchell guilty of felony theft the judge presiding in that court sentenced the defendant to imprisonment for fifteen years—the maximum penalty for that offense. Maryland Code (1957, 1987 Repl.Vol., 1989 Cum.Supp.), Art. 27, § 342(f)(1). The judge announced that the hearing was over; the guards were in the process of removing Mitchell from the courtroom. Mitchell, however, managed to turn around and give the judge "the finger."

This expression of dissatisfaction with a heavy sentence, delivered after the hearing had terminated, might, perhaps, have been overlooked without any great harm to the dignity

of the court or the administration of justice.[1]  But the judge chose not to overlook it.  Instead, he summarily found Mitchell in criminal contempt and imposed a sentence of five years consecutive to the 15 year theft sentence.

Mitchell's gesture did not disrupt any proceedings, for none were then pending; his case was over and no other had been called.  *See State v. Sayre,* 314 Md. 559, 565–566, 552 A.2d 553, 556 (1989).  So far as the record shows, this act did not produce any disorder in the courtroom; indeed, we cannot tell whether it was even observed by any one except the judge who was so offended by it.

The majority believes that immediate action was necessary to maintain "dignity [and] decorum . . . in the courtroom."  *Mitchell v. State,* 320 Md. 756, 762, 580 A.2d 196, 199 (1990).  Perhaps one may be permitted to wonder just how a blatantly unconstitutional sentence [2] enhances respect for a court, or promotes the cause of dignity and decorum therein.  Such a sentence, indeed, may "deprive the contempt proceeding of the appearance of evenhanded justice which is at the core of due process," *Mayberry v.*

---

**1.**  Defendants have been known to indicate unhappiness with sentences, and some of them have suffered more severely than Mitchell for making their views known to the court.  In one case, for example, a prisoner condemned for felony threw a brickbat at the judge, narrowly missing the jurist.  For this act of direct contempt the defendant's right hand was "cut off and fixed to the gibbet, upon which he was himself immediately hanged in the presence of the Court."  *Anonymous,* 73 Eng.Rep. 416 n. 17 (1631).  This case is mentioned in *State v. Roll and Scholl,* 267 Md. 714, 733 n. 14, 298 A.2d 867, 879 n. 14 (1973), where the venue is said to have been France, possibly because the original report is written in law French.  *See* 2 Dyer 188b (1688).  In point of fact, however, the proceedings were before Chief Justice Richardson at the Salisbury assizes in the summer of 1631.  73 Eng.Rep. 416.

**2.**  As the majority concedes, "[a] sentence for a single criminal contempt cannot exceed six months imprisonment unless the defendant has been given a jury trial or waived that right."  *Mitchell v. State,* 320 Md. 756, 760 n. 1, 580 A.2d 196, 198 n. 1 (1990).  The judge later reduced the sentence to five months and 29 days, but that does not affect the unconstitutionality of his initial approach to vindication of the dignity of the court.

*Pennsylvania,* 400 U.S. 455, 469, 91 S.Ct. 499, 507, 27 L.Ed.2d 532, 542 (1971) (Harlan, J., concurring), and which is one of the values the contempt power is supposed to protect. "Summary punishment always, and rightly, is regarded with disfavor and, if imposed in passion or pettiness, brings discredit to a court as certainly as the conduct it penalizes." *Sacher v. United States,* 343 U.S. 1, 8, 72 S.Ct. 451, 454, 96 L.Ed. 717, 723 (1952).

But I put these ruminations aside. Under well-settled principles, what Mitchell did was a direct contempt of court, a conclusion even he does not reject. *Mitchell,* 320 Md. at 761, 580 A.2d at 199. The question is whether the judge who presided at trial and sentencing should have been the one to sanction him for it.

The answer to that question can best be formulated if we first examine the nature of direct contempt. Courts and commentators generally accept the necessity for power to punish for direct contempts, R. Goldfarb, *The Contempt Power* 4 (1963), for "a court ... should not be at the mercy of the obstreperous and uncouth." *Id.* at 306. Nevertheless, the power of contempt "is, perhaps, nearest akin to despotic power of any power existing under our form of government." *State ex rel. Attorney General v. Circuit Court,* 97 Wis. 1, 8, 72 N.W. 193, 194–195 (1897). Our approach to the subject should be guided by recognition of this fact, and by the wise admonition that the limit of the contempt power is *"the least possible power adequate to the end proposed." Anderson v. Dunn,* 19 U.S. 204, 231, 5 L.Ed. 242, 248 (1821) [emphasis in original]. As the Supreme Court has put it more recently:

> The power of contempt which a judge must have and exercise in protecting the due and orderly administration of justice and in maintaining the authority and dignity of the court is most important and indispensable. But its exercise is a delicate one and care is needed to avoid arbitrary or oppressive conclusions. This rule of caution is more mandatory where the contempt charged has in it the element of personal criticism or attack upon the

judge.... [W]here conditions do not make it impractica-
ble, or where the delay may not injure public or private
right, a judge called upon to act in a case of contempt by
personal attack upon him, may, without flinching from his
duty, properly ask that one of his fellow judges take his
place.

*Cooke v. United States*, 267 U.S. 517, 539, 45 S.Ct. 390,
395–396, 69 L.Ed. 767, 775 (1925).

We have expressed similar views. In *State v. Roll and
Scholl*, 267 Md. 714, 732, 298 A.2d 867, 878 (1973), Judge J.
Dudley Digges, for this Court, warned that "[t]he power to
immediately and summarily hold a person in contempt is
awesome and abuses of it must be guarded against." The
"magnitude of [the] force [of the contempt power] demands
care and discretion in its use so as to avoid arbitrary,
capricious or oppressive application of this power." *Id.* at
717, 298 A.2d at 870. Judge Digges went on to observe
that the

United States Supreme Court has often expressed the
opinion that a summary contempt proceeding should be
the exceptional case. Such proceedings are only proper
in cases where the action of the alleged contemnor poses
[such] an open, serious threat to orderly procedure that
instant, and summary punishment ... is necessary. In
other words, direct contempt procedures are designed to
fill the need for immediate vindication of the dignity of
the court.... And, while not required, when a judge
waits until the end of the trial, it is generally wise to ask
a fellow judge to rule on the nature of the conduct of the
contemnor if it has in it elements of personal attack upon
the judge. The judge must banish personal impulses to
reprisal, or to vent his spleen. [Footnote omitted].

267 Md. at 733, 298 A.2d at 878–879.

Thus, both the United States Supreme Court and this
Court are among those that have recognized the potential
hazards of summary contempt power, and the need to limit
its exercise with prudence, in order to avoid abuses to our
system of justice at least as serious as those inflicted by

contemnors. And both Courts have pointed out that one method of protecting against the danger of vindictive and arbitrary application of this power (or the appearance of that sort of retaliation) is to require the contempt determination be made by some judge other than one who has been vilified or attacked or who has become " 'personally embroiled' " in the proceedings. *Mayberry,* 400 U.S. at 465, 91 S.Ct. at 505, 27 L.Ed.2d at 540. *See also* J. Shaman, S. Lubet & J. Alfini, *Judicial Conduct and Ethics* § 5.09 at 113 (1990) ("where a verbal attack upon a judge becomes particularly offensive, or where a judge becomes enraged at offensive conduct, recusal is necessary").

The majority reads cases like *Mayberry, Taylor v. Hayes,* 418 U.S. 488, 94 S.Ct. 2697, 41 L.Ed.2d 897 (1974), and *Sacher* as holding that due process requires disqualification of the personally attacked judge only when the contempt determination is deferred until the conclusion of the trial. *Mitchell,* 320 Md. at 763–766, 580 A.2d at 200–201. For purposes of this dissent, I shall not quarrel with that reading. Even accepting it, however, it seems to me that under the circumstances of this case it was an abuse of discretion for the presiding judge not to step aside.

That a judge who has been personally attacked has discretion to decide whether to handle summary contempt proceedings, assuming he is not constitutionally forbidden from doing so, is clear. *See, e.g., Cooke,* 267 U.S. at 539, 45 S.Ct. at 395–396, 69 L.Ed. at 775; *Roll and Scholl,* 267 Md. at 733, 298 A.2d at 879; *Maryland Trial Judges' Benchbook,* § 3–506(b) ("A judge who has become personally involved with the defendant should not preside at the hearing even if the defendant consents."). It is also clear that the justification for summary proceeding before the offended judge is the necessity for immediate action: the exercise of "such power, although arbitrary in its nature and liable to abuse, is absolutely essential to the protection of the courts in the discharge of their functions." *Ex parte Terry,* 128 U.S. 289, 313, 9 S.Ct. 77, 83, 32 L.Ed. 405, 412 (1888). In cases like *Taylor, Mayberry,* and *Sacher,* each

of which (unlike this case) involved actually disruptive behavior, the trial judge deferred the contempt proceeding until the trial was over. By doing so, the judge implicitly recognized that there was no necessity for immediate action; thus the justification for summary action by the offended judge was removed.

In this case, the contempt took place, for all practical purposes, after the proceedings were over. There was nothing to disrupt (and no disruption in fact) and no need for summary action. And the judge was "personally embroiled." The magnitude and unconstitutionality of the sentence is evidence of that. *Spruell v. Jarvis,* 654 F.2d 1090, 1096 (5th Cir.1981). Under like circumstances, where there was an isolated remark virtually at the end of a trial, and no actual obstruction of the proceedings, the Supreme Court of Pennsylvania concluded that "the record does not show a necessity for the imposition of summary punishment [by the presiding judge and] the employment of such a procedure must be held an abuse of discretion." *Com. v. Stevenson,* 482 Pa. 76, 90, 393 A.2d 386, 393 (1978) [footnote omitted]. *See also Commonwealth v. Africa,* 466 Pa. 603, 623–624, 353 A.2d 855, 865 (1976) and *State v. Van Laarhoven,* 90 Wis.2d 67, 70–71, 279 N.W.2d 488, 489 (Wis.Ct.App. 1979).

Very recently, this Court held, without dissent, "that when the asserted basis for recusal [of a trial judge] is personal misconduct of the ... judge that generates serious issues about his or her personal misconduct, then the trial judge must permit another judge to decide the motion for recusal." *Surratt v. Prince George's County,* 320 Md. 439, 466, 578 A.2d 745, 758 (1990). We were guided to that holding in large part by the admonition of *Roll and Scholl, supra* that " 'it is generally wise to ask a fellow judge to rule on the nature of the conduct of [a] contemnor if it has in it the elements of a personal attack upon the judge.' " *Surratt,* 320 Md. at 466, 578 A.2d at 758 (quoting *Roll and Scholl,* 267 Md. at 733, 298 A.2d at 872 (Mitchell's conduct here had in it precisely those elements).

Surely, if a judge whose recusal is sought on the ground of personal misconduct cannot decide the recusal motion, a judge who is personally attacked should not decide a summary direct criminal contempt proceeding, especially when there has been no actual disruption of an ongoing trial or sentencing.

I agree with Ronald Goldfarb that "it seems ... reasonable to conclude that the impersonal authority of law is better guarded and applied by one who is not himself personally involved in a given conflict." *The Contempt Power* at 255.

The trial judge abused his discretion when he conducted the summary contempt proceedings against Mitchell. I would reverse the judgment of the circuit court, and remand for a new contempt proceeding before a different judge.