## JOHN JONES *v.* STATE OF MARYLAND

[No. 1378, September Term, 1975.]

*Decided July 30, 1976.*

The cause was argued before GILBERT, C. J., and MOYLAN, DAVIDSON and LOWE, JJ.

*Elsbeth L. Bothe, Assistant Public Defender*, with whom were *Alan H. Murrell, Public Defender*, and *George E. Burns, Jr., Assistant Public Defender*, on the brief, for appellant.

*Alexander L. Cummings, Assistant Attorney General*, with whom were *Francis B. Burch, Attorney General*, and *William A. Swisher, State's Attorney for Baltimore City*, on the brief, for appellee.

LOWE, J., delivered the opinion of the Court.

Sir William Blackstone, "One of the Justices of His Majesty's Court of Common Pleas," recorded in his *Commentaries on the Laws of England* that *"[t]he power to punish for contempt* seems to have originated in the fact

that the king, in contemplation of law, is supposed to be always present in his courts." II *Cooley's Blackstone*, Bk. IV, p. 283, n. 1 (4th ed.) A reminiscence of that ominous majesty is present in contemporary courts as the robed figure presiding to dispense the sovereign's justice. The inherent power of contempt is the means of assuring that justice will be decorously dispensed.

Obviously the dignity surrounding the conduct of a trial has certain minimum standards, but there is considerable play in the wheels of justice, and beyond those minimum standards an area exists within which the rigidity of courtroom decorum is left to the discretion of the presiding judge. Because such individual differences may exist in the exercise of this potentially drastic power of the court, trial judges must be on guard against confusing offenses to their sensibilities with obstructions of the administration of justice. *Brown v. United States*, 356 U. S. 148, 153. The judge must be convinced *beyond a reasonable doubt* that the conduct complained of is contemptuous, *Goldsborough v. State*, 12 Md. App. 346, 358. At common law a court of competent jurisdiction was the sole judge of contempts, and its judgment in such cases was final and conclusive and was not reviewable by any other tribunal by appeal or otherwise. *Kelly v. Montebello Park Co.*, 141 Md. 194. Recognizing that judges too are subject to human vagaries and that what is flattery to one may be offensive to another, the Legislature has provided that "[a]ny person may appeal from any order … passed to … vindicate the dignity of the court and adjudging him in contempt of court." Cts. Art., § 12-304.

The appellate courts must also be on their guard, however.

> "It is no less important for this Court to use self-restraint in the exercise of its ultimate power to find that a trial court has gone beyond the area in which it can properly punish for contempt. We are not justified in sliding from mere disagreement with the way in which a trial court has dealt with a particular matter . . . into a condemnation of the court's action as an abuse of discretion." *Brown, supra*, 356 U. S. at 153-154.

492

To facilitate appellate review, Md. Rule P3 requires that the court's order of contempt recite the facts upon which the contempt is based. The purpose of this recitation of facts is not to provide the reviewing Court an opportunity to reevaluate and weigh the evidence, but to provide a basis for an assessment of its legal sufficiency, *Kandel v. State*, 252 Md. 668, 672.

The appellant in the case now under consideration was an observer at the trial of a friend conducted in the Criminal Court of Baltimore. The act for which he was held in direct contempt by the judge consisted of slapping the back of the bench in front of appellant, apparently in exasperation at the justice meted out to him by the judge following an inquisitional proceeding conducted to determine what, if any, disorder might have occurred out of the presence of the court while the trial was in progress. Appellant was summarily sentenced to three months in the Baltimore City Jail for that act (16 days of which appellant served prior to this appeal).[1]

> "Well, just one minute. The Court wishes to observe that in the presence of the Court and while the Court was on the Bench, this young man arose and slammed his hands down upon the Bench [back of the bench seat] in such a way as to constitute a direct contempt of this Court. Accordingly, Madam Reporter, you will transcribe these proceedings as required by the rules for proceedings for summary conviction for direct contempt and finds him guilty of contempt of this Court and prejudice himself on that contempt will serve three months in the Baltimore City Jail.
>
> Sheriff, take him away."

In explaining his decision to the remaining observers, the judge made it clear that he predicated his decision more

---

1. While we are precluded from modifying sentences in most criminal cases, Gee v. State, 2 Md. App. 61, 68, we have the power to do so in matters of criminal contempt. See Ex Parte Bowles, 164 Md. 318, 334, cited with approval in Freedman v. State, 176 Md. 511, 518.

upon that which had led up to appellant's act than upon the act itself.

"The Court wishes to point out to all who remain, that the purpose of a trial in court is to determine the truth of the matters in controversy. It cannot be done in an atmosphere of intimidation or any sort of cavalier conduct where the officers of the state and city who are there to discharge their functions. Any one who indicates any disrespect to these officers or who attempt in any way to hassle them, molest them or embarrass them is going to be dealt with promptly and severely by this Court.

We welcome your attendance here in the courtroom. One of the rights guaranteed to every citizen in this country by the Constitution is to a speedy, fair and public trial. You, as members of the public, are welcome to attend this trial and must do so in an orderly fashion and must make no attempt to contact officers or those who come here to testify. Further actions of this sort will be dealt with in summary fashion by the Court."

As previously noted, appellant had been one of a number of spectators in the courtroom and was especially interested in the outcome of the trial because of his friendship with one of the defendants. We infer from what subsequently transpired that during a recess of that trial, the judge was informed that some sort of disturbance was taking place in the courtroom. The judge promptly reconvened the court "to determine what, if anything," had occurred.

"THE COURT: Everybody have a seat.

Madam Reporter, the Court desires the record to show, during the recess, after the jury had been sent to the jury room, adjoining to the Courtroom and Chamber of this court room that some disturbance had occurred in the court room. We have now reconvened the court out of the presence of the defendants because we apprehended this aspect of the matter has no connection with them

whatsoever and not intended to be a part of the trial in progress, to determine what, if anything, occurred in the courtroom and whether the Court should take notice of it."

When the attorney for the defendant then being tried interposed an objection to this procedure on behalf of her client, the court attempted to explain:

"It has nothing to do with the defendants. It is a matter of internal security and matter in the court and nothing to do with the trial in progress. It is independent of the case we are now trying."

The first cast by the judge, directed toward the security force, was unproductive:

"Now, if you gentlemen of the Security Force will advise the Court what, if anything, came to your attention that you would like the Court to take notice of.

Just tell me what the problem is.

SHERIFF HOLT: I was sitting at my desk here, Your Honor, and saw one of the spectators in the back lean forward and speak to the lady in the red coat. And when she saw me looking at her she sat back and smiled, but the lady in the red coat sort of turned around halfway and she didn't finish it. It was just something that the spectators said to her."

That response having shown little if any disorder, the judge turned his inquiry toward the police officers who were present in the courtroom as witnesses. This cast was more successful:

"THE COURT: Anybody say anything to any of you gentlemen?

OFFICER HOOK: Yes, Your Honor, they did.

While I was out in the hallway, this one got real smart. He said, I was so shaky, if I had my gun in my hand he wouldn't like to be in my path.

Then I am trying to get in the elevator to get in

Traffic Court, he brushes right against me; he says, I bumped into him and started to have a lot of words to say about it, you know, meaning he didn't believe my testimony or whatever I had to say. Evidently he wasn't happy with what I testified to. I got in the elevator. I didn't get a chance to say nothing to him."

The court turned its attention to appellant and demanded an explanation for his presence.

"THE COURT: Stand up. What is your name?

A SPECTATOR: John Jones.

THE COURT: What are you doing here in the courtroom?

MR. JONES: I came here to see my friend that is on trial.

THE COURT: You came here to watch the case in trial?

MR. JONES: Yes."

Appellant explained his conduct with candor:

"THE COURT: Did you say anything to the officer:

MR. JONES: Yes.

THE COURT: What did you say to him?

MR. JONES: Like he said I said, 'He was so shaky if he had his gun in his hand I wouldn't like to be in his path.'

THE COURT: Say anything else to him?

MR. JONES: Yes. When he went on the elevator, I said, 'You can at least say excuse me.' I had my head turned and he almost knocked me down.

I was standing in one place after I had finished my conversation with you, and you came from the water fountain into me and onto the elevator.

THE COURT: All right, have a seat."

The police officer involved stated that:

> "OFFICER HOOKS: Every time I walked out one of them said, you better make sure you tell the truth, better not lie." [2]

Another officer pointed out that he too had been accosted by the appellant:

> "Yes, Your Honor. Same gentleman sitting here also made a remark to me as I came from the adjoining courtroom this morning right before we recessed for lunch. He made the statement aloud to his friends, that here comes John Wayne, look at him now.
>
> I greeted the young man. I said, 'How are you?' Then he made some other remarks that I could not hear."

The broad mesh used for the final [3] cast brought forth little of significance to the court's inquiry. Judge Bowen then decided to cite the appellant for constructive contempt and ordered that appellant be held *without bond.*

---

[2]. There is no indication in the record that the "one of them" was appellant.

[3]. "THE COURT: Anybody else have anything else to say about the matter?

MS. REYNOLDS: The girl behind me called me a white liar. I started to turn around and look at the person sitting behind me.

THE COURT: Can you identify that person?

MS. REYNOLDS: I turned and then I just turned forward again, Sir, she was directly behind me.

THE COURT: You want to say something?

A SPECTATOR: Yes. I was sitting behind her and I didn't say nothing to her.

MS. BOTHE: Could I ask that these people identify themselves as they say anything.

THE SPECTATOR: My name is Debra Brown.

THE COURT: Have a seat.

Any of you gentlemen of the Security Force have anything to say about these other two men here?

NO AFFIRMATIVE RESPONSE."

"Madam Reporter, the Court asks that you transcribe this portion of the proceedings. The Court cites this man here for contempt.

Mr. Sheriff, you take him into your custody.

The State's Attorney, you file the appropriate proceedings to proceed against him for constructive contempt of this Court.

MR. BURGER: Yes, Your Honor.

THE COURT: You will be held without bond pending the filing of the charges, sir."

It was at this juncture that appellant "slammed his hands down" in a manner which Judge Bowen found contemptuous. The citation for the constructive contempt is not before us except as the facts leading to it relate to the provocation which culminated in the conduct held by Judge Bowen to be direct contempt.

Because we are unable to find sufficient evidence in the record from which the trial judge could conclude beyond a reasonable doubt that appellant's in-court conduct constituted a direct contempt, we will reverse the judgment of the trial court. We also base our reversal upon the failure of the trial judge to comply with Md. Rule P3. b:

"Where a direct contempt is committed, the court shall sign a written order to that effect. The order shall recite the facts, be signed by the judge and entered of record. The order shall state which of the facts were known to the court of its own knowledge and as to any facts not so known, the basis for the court's finding with respect thereto."

The purpose of that rule is to enable us to determine by an inspection of the record, whether a contempt has been committed and whether the court had jurisdiction to punish it. See Annot., 154 A.L.R. 1227.

We have gleaned as well as we were able from the record and from the judge's concluding observations to the spectators, the appellant's conduct, and the reasons for the judge's decision. As indicated, there is nothing in the

transcript (all relevant portions of which we have reproduced in this opinion) to indicate "beyond a reasonable doubt" that appellant's conduct was in direct defiance of the dignity and authority of the tribunal or interfered with the due and proper administration of justice. *In Re Lee,* 170 Md. 43, 47, *cert. denied,* 298 U. S. 680. To the contrary, the record reveals that in all communications with the court, appellant's language was respectful and forthright, if not humble. The appellant's single act of slamming his hands on the bench before him did not "obstruct justice," nor was it necessarily defiant or disrespectful in and of itself. Short of holding that such an expression of exasperation is contempt per se, there is nothing in the surrounding circumstances from which we can interpret the act as contemptuous. A reasonable doubt clearly exists. If undisclosed observations were at the root of the court's action, their substance is not apparent from the record.

While it is conceivable that the recitation of facts in a "P3. order" may have added some element of proof not apparent to us from the record, it is more likely to have been limited by necessity to conclusions and characterizations. For that reason, we see no purpose to be served by remanding the case for compliance by the trial judge with the mandate of Rule P3.

> "Unfortunately, if such actions on the appellant's part did take place, they are not stated in the contempt order and, as a consequence, this Court cannot take notice of their occurrence. This only emphasizes the importance, as well as the necessity, of having the trial courts of the State carefully adhere to the mandate of Rule P3 b that a contempt order 'shall recite the facts' constituting the contempt, and not be limited merely to the court's conclusions or characterizations concerning the contemnor's behavior. (Emphasis added.) This requirement is as much directed toward providing meaningful appellate review of a contempt conviction as it is aimed at assuring procedural protection for the defendant. There will be

occasions, and the instant case may have been one, where the transcript of the proceedings will not furnish a completely accurate recitation of the events which precipitated a summary conviction of contempt. It is the contempt order, therefore, to which appellate courts must look in order to ascertain the full facts. Accordingly, the trial courts should remember that to the extent a contempt order does not specify those *facts*, appellate review of a conviction for summary contempt will be *pro tanto* circumscribed." *Robinson v. State,* 19 Md. App. 20, 28-29.

Nor do we think that Judge Bowen's general and unparticularized statement to the spectators lends any support to the conclusion that appellant's in-court conduct constituted direct criminal contempt. *Muskus v. State,* 14 Md. App. 348, 361.

We do not decide whether appellant's conduct, including the remarks admittedly made by appellant to the police, constitute constructive contempt. That issue is not before us. Whatever the outcome of that might have been, appellant would have an opportunity to defend and explain his conduct.[4] See *Hitzelberger v. State,* 173 Md. 435.

We conclude with a caveat.

"In vacating appellant's conviction for contempt, we remain aware of the great provocation to which the trial courts are often subjected by the conduct of arrogant and insolent criminal defendants. Nevertheless, no man should be deprived of his liberty on the basis of judicial *ipse dixits* alone. To

---

4. "While it is never a complete defense to a charge of contemptuous conduct that no such conduct was intended, *Ex Parte Bowles, supra,* at pp. 332-333, where the act comprising the alleged contempt is not plainly contemptuous on its face, a claim of good faith has been held entitled to serious consideration and has been found determinative in some cases. *See May Hosiery Mills v. United States District Court,* 64 F. 2d 450 (9th Cir.); *Caldwell v. United States,* 28 F. 2d 684 (9th Cir.); *Sprinkle v. Davis, supra* [111 F. 2d 925 (4th Cir.)]; 17 C.J.S. *Contempt,* p. 20." Goldsborough v. State, 12 Md. App. at 357.

hold otherwise would be to ignore the language and clear purpose of Rule P3 b and flaunt due process.

We said in *Muskus v. State, supra* at 361, that 'while trial judges must be given wide latitude to punish contemptuous conduct, they must ever be on guard against confusing offenses to their sensibilities with obstructions to the administration of justice.' That advice was not followed in this case." *Robinson v. State,* 19 Md. App. at 29.

*Judgment reversed.*