80 A.3d 698

**Terry Wayne HAMMONDS**

v.

**STATE of Maryland.**

**No. 14, Sept. Term, 2013.**

Court of Appeals of Maryland.

Dec. 3, 2013.

24

Claudia A. Cortese, Assistant Public Defender (Paul B. DeWolfe, Public Defender, Baltimore, MD), on brief, for Petitioner.

Michelle W. Cole, Asst. Atty. Gen. (Douglas F. Gansler, Atty. Gen. of Maryland, Baltimore, MD), on brief, for Respondent.

Argued before: BARBERA, C.J., HARRELL, BATTAGLIA, GREENE, ADKINS, McDONALD, WATTS, JJ.

GREENE, J.

In the present case, we are asked to determine whether the trial court abused its discretion when it revoked Petitioner Terry Wayne Hammonds's ("Petitioner" or "Hammonds") probation for failing to "obey all laws," when the court determined that Petitioner committed direct criminal contempt of court and violated Maryland Code § 9–303(a) (2002 Repl. Vol., 2005 Cum.Supp.) of the Criminal Law Article (hereinafter " § 9–303(a)"). Specifically, on appeal, we address (1) wheth-

er Petitioner was in direct criminal contempt of court when he tore up a copy of his probation papers while seated next to the exit door in the courtroom following his criminal trial and sentencing, and when there was no finding of contempt by the trial judge at or near the time of the alleged contemptuous act and no evidence showed that Petitioner's action interrupted the proceedings; and (2) whether Petitioner committed a threat within the meaning of § 9–303(a) when he threatened to harm a witness or victim but did not convey that threat to the witness or victim or make the threat with the belief that the threat would be communicated to the witness or victim. We shall hold that the record does not support a finding that Petitioner was in direct contempt of court, and that § 9–303(a) by its terms does not require communicating the threat to the victim or witness or a belief that the threat may be communicated to the victim or witness. Accordingly, we reverse the judgment of the Court of Special Appeals and remand the case for further proceedings.

## I. Factual and Procedural History

On April 23, 2010, Petitioner was on trial for second degree assault, which stemmed from an incident the previous year, when Petitioner struck and kicked Audrey Wilgis ("Ms. Wilgis"), his girlfriend at that time, during an argument. Following a guilty verdict, Ms. Wilgis gave a victim impact statement,[1] making claims as to her financial hardships and that she "just want[ed] to be left alone." Petitioner was sentenced to ten years in prison, with all but 18 months suspended, and three years probation. Under the "Standard Conditions" of Petitioner's Probation/Supervision Order, Petitioner was required to "[o]bey all laws."

Approximately one week later, the State petitioned to revoke Hammonds's probation based on his actions following the April 23, 2010 sentencing. Thereafter, a probation revocation

---

1. It was stipulated by the parties that Ms. Wilgis did not testify during the trial, but that her comments at the end of the case were in the form of "victim impact."

hearing was conducted on June 3, 2010. At that hearing, the judge stated that the reasons for the hearing were "certain actions you took in the courtroom after I sentenced you, which I actually observed, as well as statements that I believe you made to other people after you left the courtroom." Deputy John Wilson, who was standing next to Petitioner at the time of sentencing, testified at this proceeding. He stated that after Petitioner received his sentence, he calmly signed his probation papers, and then began to tear up his personal copy of the documents while seated "in a chair right next to the exit door." Deputy Wilson then escorted Petitioner out of the courtroom and back to lockup. As they were walking down the hall, Petitioner "was talking out loud and he made several comments" in a tone "louder than normal. It was just loud." Deputy Wilson assumed the door to the courtroom was closed at the time Petitioner made these statements. He testified that Petitioner stated: "She don't know it, but she just signed her death warrant," and "she's going to be one sorry bitch in a year and a half." Petitioner then repeated these statements to other detainees when he was back in lockup. Deputy Wilson reported to the State's Attorney's Office that Petitioner made these statements.

Following Deputy Wilson's testimony and after relating her own observations, the trial judge revoked Petitioner's probation, finding that "Hammonds was in contempt by his purposely and in this Court's observation agitated manner ripping up the form, and that the threats he made this Court finds were made directed at the witness in this case." On October 29, 2012, the Court of Special Appeals issued an unreported opinion affirming the Circuit Court's decision, and held that there was no abuse of discretion when that court revoked Hammonds's probation. The intermediate appellate court held that, in reviewing the finding of contempt, "[g]iven that Hammonds's action was conspicuous enough to draw the trial judge's attention while court was in session," the ruling was not clearly erroneous. As to the court's finding that Petitioner violated § 9–303(a), the intermediate appellate court held that the "essential elements" of the retaliation statute were

established, and that the statute does not specifically require threats be made directly to the witness or victim, or with the belief that they would be communicated to the witness or victim. The court further emphasized that a conviction is not required to find that Petitioner failed to "obey all laws." We granted *certiorari, Hammonds v. State,* 430 Md. 344, 61 A.3d 18 (2013), to consider the following questions: [2]

1. Can an individual be found, a month after the fact, to have been in direct contempt of court for tearing up court documents while seated next to the exit door of the court-room after the court had moved on to another matter and where the court made no comment or finding of contempt at the time and there is no evidence that the proceedings were interrupted by the behavior?

2. Can Md.Crim. Law Art. § 9–303(a)'s proscription against threatening to harm a reporting victim or witness be violated without that threat of retaliation being made direct-ly to the witness or with the intent that the threat be conveyed to the witness?

3. Did the trial court improperly revoke Petitioner's proba-tion for acts and comments which the court deemed to constitute direct contempt and a violation of Md.Crim. Law Art. § 9–303(a)?

## II. Standard of Review

This Court has held that a probation revocation case typically involves two stages: "(1) a retrospective factual question whether the probationer has violated a condition of probation; and (2) a discretionary determination by the sen-tencing authority whether violation of a condition warrants revocation of probation." *Wink v. State,* 317 Md. 330, 332, 563 A.2d 414, 415 (1989). The State must satisfy the first stage by a preponderance of the evidence standard. *Id.*

At the second stage, that of whether the court's discretion should be exercised to revoke probation, appellate review is

---

**2.** These questions were modified for brevity.

for an abuse of discretion. Trial judges do not revoke probation unless satisfied that probation should be revoked. Appellate review to determine whether there was reasonable satisfaction would simply analyze whether discretion was abused for want of any reasonable basis for the revocation.

Were the trial court satisfied to exercise its discretion to revoke, in a case where there is not legally sufficient evidence of a violation, appellate review of the reasonableness of the trial court's satisfaction should reveal the clearly erroneous or legally insufficient nature of the fact-finding of a violation.

*Wink,* 317 Md. at 338–39, 563 A.2d at 418. *See also State v. Dopkowski,* 325 Md. 671, 678, 602 A.2d 1185, 1188 (1992) ("Abuse of discretion will be found only if the trial court has erroneously construed the conditions of probation, has made factual findings that are clearly erroneous, or has acted arbitrarily or capriciously in revoking probation." (citation omitted)).

## III. Contempt

■ As one of two grounds for Petitioner's revocation of probation, Petitioner was found in contempt of court for his actions inside the courtroom following his April 23, 2010 trial and sentencing for second-degree assault. At his probation revocation proceeding on June 3, 2010, the trial court determined that Petitioner violated the condition of his probation that he "obey all laws" by committing a contemptuous act at the earlier hearing. We shall hold that the record is not sufficient to support a finding that Petitioner was in contempt of court—specifically, direct criminal contempt of court—when he tore up his personal copy of the probation papers while seated next to the exit door of the courtroom following his sentencing.

■ This Court has held that "[o]ne weapon in the court's arsenal useful in defending its dignity is the power to punish for contempt. But the magnitude of its force demands care

and discretion in its use so as to avoid arbitrary, capricious or oppressive application of this power." *State v. Roll,* 267 Md. 714, 717, 298 A.2d 867, 870 (1973). "Because such individual differences may exist in the exercise of this potentially drastic power of the court, trial judges must be on guard against confusing offenses to their sensibilities with obstructions of the administration of justice." *Jones v. State,* 32 Md.App. 490, 491, 362 A.2d 660, 661 (1976). This Court has explained:

> We recognize two forms of contempt—direct and constructive—and two types of each form—criminal and civil. Direct contempt is committed in the presence of the trial judge or so near to him or her as to interrupt the court's proceedings, while constructive contempt is any other form of contempt. Criminal contempt serves a punitive function, while civil contempt is remedial or compulsory and must provide for purging.

*Smith v. State,* 382 Md. 329, 338, 855 A.2d 339, 344 (2004) (citations omitted); *see also Ashford v. State,* 358 Md. 552, 563, 750 A.2d 35, 40–41 (2000). As conceded by both parties, if Petitioner's paper tearing incident was contemptuous, it would fall into the category of direct contempt. "A direct contempt occurs when the actions of the contemnor interrupt the order of the courtroom and interfere with the conduct of business." *Roll,* 267 Md. at 734, 298 A.2d at 879. Moreover, "[w]hen such disruption occurs within the sensory perception of a presiding judge he [or she] will have a sufficient knowledge of the contemptuous act which tends to interrupt the proceedings and will not have to rely on other evidence to establish all the details, though some of them can be supplied by additional testimony." *Id.*

■ Md. Rules 15–203 and 15–204 delineate what constitutes a direct contempt, and the proper process to follow when adjudicating a person for such an act.[3] When a trial court

---

3. Md. Rule 15–203 provides:

(a) Summary Imposition of Sanctions. The court against which a direct civil or criminal contempt has been committed may impose sanctions on the person who committed it summarily if (1) the

does not impose sanctions summarily for an alleged contemptuous act under Rule 15–203, Rule 15–204 mandates that any later proceeding involving a direct contempt shall be conducted pursuant to Rule 15–205 (constructive criminal contempt) or 15–206 (constructive civil contempt). *See King v. State*, 400 Md. 419, 441, 929 A.2d 169, 182 (2007) (noting that the later

presiding judge has personally seen, heard, or otherwise directly perceived the conduct constituting the contempt and has personal knowledge of the identity of the person committing it, and (2) the contempt has interrupted the order of the court and interfered with the dignified conduct of the court's business. The court shall afford the alleged contemnor an opportunity, consistent with the circumstances then existing, to present exculpatory or mitigating information. If the court summarily finds and announces on the record that direct contempt has been committed, the court may defer imposition of sanctions until the conclusion of the proceeding during which the contempt was committed.
(b) Order of Contempt. Either before sanctions are imposed or promptly thereafter, the court shall issue a written order stating that a direct contempt has been committed and specifying:
 (1) whether the contempt is civil or criminal,
 (2) the evidentiary facts known to the court from the judge's own personal knowledge as to the conduct constituting the contempt, and as to any relevant evidentiary facts not so known, the basis of the court's findings,
 (3) the sanction imposed for the contempt,
 (4) in the case of civil contempt, how the contempt may be purged, and
 (5) in the case of criminal contempt, (A) if the sanction is incarceration, a determinate term, and (B) any condition under which the sanction may be suspended, modified, revoked, or terminated.
(c) Affidavits. In a summary proceeding, affidavits may be offered for the record by the contemnor before or after sanctions have been imposed.
(d) Record. The record in cases of direct contempt in which sanctions have been summarily imposed shall consist of (1) the order of contempt; (2) if the proceeding during which the contempt occurred was recorded, a transcript of that part of the proceeding; and (3) any affidavits offered or evidence admitted in the proceeding.
Md. Rule 15–204 provides:
In any proceeding involving a direct contempt for which the court determines not to impose sanctions summarily, the judge, reasonably promptly after the conduct, shall issue a written order specifying the evidentiary facts within the personal knowledge of the judge as to the conduct constituting the contempt and the identity of the contemnor. Thereafter, the proceeding shall be conducted pursuant to Rule 15–205 or Rule 15–206, whichever is applicable, and Rule 15–207 in the same manner as a constructive contempt.

proceedings were subject to compliance with Rule 15–205). Here, had the trial judge later opted to pursue sanctions against Petitioner, she would have done so under the guidelines of Md. Rule 15–205 for criminal contempt.

In the instant case, Petitioner is confronted with an allegation of criminal contempt on the basis of conduct which occurred in the courtroom and was allegedly a violation of the condition of his probation that he obey all laws. *See Dean v. State*, 291 Md. 198, 203, 434 A.2d 552, 555 (1981) (holding that if the trial court is reasonably satisfied that the probationer committed a *crime*, revocation is proper on the grounds that the probationer failed to "obey all laws"). In order for a charge of direct criminal contempt to stand, the alleged contemnor must have acted willfully. *See Ashford*, 358 Md. at 563, 750 A.2d at 40. In a direct criminal contempt situation, "[w]hat is sought to be guarded against is an inability to comply caused by a *deliberate effort* or a *wilful act* of commission or omission and committed with the knowledge that it would frustrate the order of the court." *Ashford*, 358 Md. at 562, 750 A.2d at 40 (emphasis added). Moreover, "[b]efore the court could make a finding of wilfulness and direct contempt, there must be legally sufficient evidence that would be admissible in a criminal case to support those findings." *King*, 400 Md. at 433 n. 3, 929 A.2d at 177 n. 3; *see Dorsey v. State*, 356 Md. 324, 343, 739 A.2d 41, 51–52 (1999) (citing *In re Ann M.*, 309 Md. 564, 568–69, 525 A.2d 1054, 1056–57 (1987) (criminal contempt is a "common law offense" which "arises from a deliberate effort or a wilful act of commission or omission by the alleged contemnor committed with the knowledge that it would frustrate the order of the court"); *Giant of Md., Inc. v. State's Attorney*, 274 Md. 158, 176, 334 A.2d 107, 117–18 (1975) ("[W]hen the contempt is charged as criminal in nature, and the conduct is not shown to be plainly contemptuous on its face, proof beyond a reasonable doubt that the alleged contemnor possessed a contumacious intent is a necessary ingredient for an adjudication of guilt.")).

 Petitioner's alleged contemptuous conduct was brought before the court in a revocation of probation proceeding, rather than in a criminal contempt proceeding, and accordingly, the process and burden of persuasion of the two proceedings are different.[4] This Court has explained that "[i]t is firmly established that a revocation of probation hearing is a civil proceeding, in which the probationer is not cloaked with the full panoply of constitutional rights and procedural safeguards enjoyed by a defendant in a criminal cause." *Gibson v. State*, 328 Md. 687, 690, 616 A.2d 877, 878–79 (1992). Before probation may be revoked, a court must be reasonably satisfied that the probationer has violated a condition of his or her probation, and this "reasonable satisfaction need be established by no more than a preponderance of the evidence." *Gibson*, 328 Md. at 695, 616 A.2d at 881. Indeed, "the quality and the quantity of the evidence offered at the civil revocation proceeding" is what controls. *Gibson*, 328 Md. at 696, 616 A.2d at 882. Therefore, even when a probationer has not been convicted of a subsequent crime, "[i]f it is shown by independent, probative evidence" that such a crime was committed and the trial court is reasonably satisfied that the probationer committed that crime, "probation may be revoked on the ground that the probationer violated the special condition of his probation that he obey all laws." *Dean*, 291 Md. at 203, 434 A.2d at 555.

The inquiry at the probation revocation proceeding, then, should have been whether the evidence showed, by a prepon-

---

4. For example, one of the differences between bringing a criminal contempt charge against a defendant in a proceeding under Md. Rule 15–205 or against a probationer in the context of a revocation of probation proceeding is whether the right to a jury trial exists. This Court has held that when an allegation of criminal contempt is brought under Rule 15–205, the proceeding is a criminal one where the defendant is entitled to a trial by jury. *Ashford*, 358 Md. at 570, 750 A.2d at 43. Conversely, a revocation of probation proceeding is a civil proceeding where the probationer is not afforded all of the constitutional rights of a criminal defendant, and therefore, the probationer is not entitled to a trial by jury, regardless of the charges against him or her. *Chase v. State*, 309 Md. 224, 238–39, 522 A.2d 1348, 1355 (1987) (citing *Howlett v. State*, 295 Md. 419, 456 A.2d 375 (1983)).

derance of the evidence, that Petitioner willfully and in the presence of the presiding judge, "interrupted the order of the court and interfered with the dignified conduct of the court's business." Md. Rule 15–203. We review the trial court's determination that Petitioner committed direct criminal contempt under an abuse of discretion standard, and shall hold that the record as to the paper-tearing incident is not sufficient to support a finding that Petitioner committed contempt of court in violation of the "obey all laws" provision in his probation order.

It is clear that Petitioner's act of tearing up his copy of the probation papers while seated next to the exit door of the courtroom failed to reach the level of a contemptuous act, particularly when compared to other Maryland case law evaluating the requirements for direct criminal contempt. Although the trial judge stated, five weeks after the incident, that she did perceive Petitioner tear up the paper on April 23, based on this record, the act of tearing up the probation papers (while seated next to the exit door of the courtroom) neither interrupted the order of the court, nor did it interfere with the dignified conduct of the court's business. Essentially, the record does not support a finding that Petitioner made a "deliberate effort" to disrespect the presiding judge or interrupt the court proceedings. Moreover, Deputy Wilson described Petitioner's demeanor as "calm" when he received his sentence and executed the paperwork, and never testified that Petitioner acted "violently," in a threatening or insulting manner, or in an out of control manner at that point in time.

In a case somewhat factually similar to the present case, the intermediate appellate court reversed the trial court's finding of contempt where a spectator in a courtroom "slammed his hands down" on the back of the bench in front of him "apparently in exasperation at the justice meted out to" his friend. *Jones v. State*, 32 Md.App. 490, 492, 362 A.2d 660, 661–62 (1976). As in the present case, the Petitioner in *Jones* was not standing before the court at the time and committed a single, non-disruptive act, apparently in exasperation with the events that occurred in court. Conversely, this Court has only

recognized more disruptive and confrontational acts to be contemptuous. In *Mitchell v. State*, 320 Md. 756, 580 A.2d 196 (1990), the defendant was found in direct criminal contempt when he "gesture[d] with his middle finger" to the trial judge after he was sentenced and while he was still in front of the presiding judge.[5] In another case, a defendant repeatedly used "loud and vociferous tones" to yell, curse, and interrupt the proceedings, which resulted in his removal from the courtroom. *Wilkins v. State*, 293 Md. 335, 336, 444 A.2d 445, 446 (1982). In that case, the finding of direct criminal contempt was not overturned. *Wilkins*, 293 Md. at 340–41, 444 A.2d at 448. The present case is clearly distinguishable from other cases in which this Court has upheld a finding of direct criminal contempt.

Moreover, while not required here, the trial judge did not acknowledge the alleged contemptuous act at the time it occurred, nor did she issue a written contempt order which would have shown her intent to pursue a finding of contempt against Petitioner. Under Md. Rule 15–204, if sanctions for direct contempt are not issued summarily, "the judge, reasonably promptly after the conduct, shall issue a written order specifying the evidentiary facts within the personal knowledge of the judge as to the conduct constituting the contempt and the identity of the condemnor. Thereafter, the proceeding shall be conducted[.]" *See Usiak v. State*, 413 Md. 384, 402, 396, 993 A.2d 39, 50, 46 (2010) (holding that "[t]he length of

---

5. Respondent cites *Mitchell* for the proposition that a court is not required to find that court proceedings were significantly disrupted in order to hold a person in contempt of court. In support, Respondent quotes: "[C]onduct of this kind is prejudicial to the administration of justice. That such conduct does not at the moment of its occurrence delay the proceedings or cause a miscarriage of justice in the matter being tried is not the test. Conduct of this type breeds disrespect for the courts and for the legal profession. Dignity, decorum, and respect are essential ingredients in the proper conduct of a courtroom, and therefore in the proper administration of justice." *Mitchell*, 320 Md. at 764, 580 A.2d at 200. This cannot be read to mean that the second element of direct contempt, namely, interruption of the order of the court and interference with the court's business, need not be proven. Respondent is correct when it argues that the disruption need not be significant, but a disruption must occur.

time the court may defer [the imposition of] sanctions [for direct contempt], however, is de minimus and typically should be no later than the end of the proceedings," but if sanctions are not imposed summarily, "it shall, 'reasonably promptly after the contemptuous conduct issue a written order specifying the evidentiary facts [in support] . . .' ")

Additionally, the record is insufficient to prove that Petitioner acted willfully, as required in a finding of direct criminal contempt, when he tore up his copy of the court documents. According to the record, the trial judge had already moved on to another matter, Petitioner was sitting next to the exit door in the courtroom, and he did not act out in a "violent" manner or direct his actions toward the court or the presiding judge. One act made in exasperation or agitation that does not disrespect the presiding judge or deliberately interrupt proceedings is not contemptuous or an obstruction to the administration of justice. Under the circumstances of the present case, the record is insufficient to support a finding of direct criminal contempt.[6]

## IV. Retaliation

The second issue requires us to consider whether a threat must be communicated to the intended victim or witness within the meaning of Md.Crim. Law Art. § 9–303(a). We shall hold that § 9–303(a) does not require that a threat be communicated to the witness or victim, or with the belief that the threat would be communicated to the witness or victim, because the elements of the crime include only (1) the making

---

**6.** Petitioner argued further that even if we were to hold that he was in contempt of court, this was not a crime in violation of the "obey all laws" provision of his probation. Although we hold that there was insufficient evidence to support a finding of direct criminal contempt, our past case law supports the notion that direct criminal contempt is a crime that would violate the "obey all laws" provision of a person's probation. *See Mitchell,* 320 Md. at 761, 580 A.2d at 199 ("Criminal contempt is a crime in every fundamental respect."); *Bloom v. Illinois,* 391 U.S. 194, 202, 88 S.Ct. 1477, 1482, 20 L.Ed.2d 522, 529 (1968) ("[T]here is no substantial difference between serious contempts and other serious crimes.").

of a threat, and (2) intent to retaliate against a witness or victim.

Section 9–303(a) prohibits retaliation against witnesses or victims of crimes who testify about or report criminal activity. The statute provides that "[a] person may not intentionally harm another, **threaten to harm another,** or damage or destroy property with the intent of retaliating against a victim or witness for: (1) giving testimony in an official proceeding; or (2) reporting a crime or delinquent act." (Emphasis added). Petitioner would have us interpret "threaten to harm" to mean "relaying a threat directly to the victim or witness." On the other hand, Respondent argues that the statute does not require that a threat be communicated to the victim or witness because the plain language of the statute says nothing about who receives the threat. According to Respondent, by arguing that the threat must be communicated to the victim or witness, Petitioner reads an additional element into § 9–303(a).

At the outset, it is important to note the general principle of criminal law that ordinarily "a crime consists of both a physical part and a mental part; that is, both an act or omission ... and a state of mind." Wayne R. LaFave, Criminal Law § 5.1(a), at 253 (5th ed.2010). Here, the criminal statute unambiguously proscribes both an *actus reus* and a *mens rea*. As relevant to this case, the prohibited action is the making of a threat to harm another, and the requisite mental state is "the intent of retaliating against a witness or victim." Against the backdrop of this general principle, we begin our analysis of the statute.

"The cardinal rule of statutory interpretation is to ascertain and effectuate the intent of the legislature .... begin[ning] with the plain language of the statute, and ordinary, popular understanding of the English language." *Briggs v. State,* 413 Md. 265, 274–75, 992 A.2d 433, 439 (2010) (citations and quotations omitted). "When the language of the statute is subject to more than one interpretation, it is ambiguous and we usually look beyond the statutory language to the

statute's legislative history, prior case law, the statutory purpose, and the statutory structure as aids in ascertaining the Legislature's intent." *Briggs,* 413 Md. at 275, 992 A.2d at 439. Moreover, as this Court has stated:

> While penal statutes are to be strictly construed against the State and in favor of the defendant, so that only punishment contemplated by the words of the statute is meted out, the construction to be given a statute must depend upon discerning the intention of the Legislature when it drafted and enacted it. This requires reading and interpreting the entire statute, neither adding, nor deleting, words in order to give it a meaning not otherwise evident by the words actually used. Moreover, construction requires that the statute be given a reasonable interpretation, not one that is illogical or incompatible with common sense.

*Harris v. State,* 331 Md. 137, 145, 626 A.2d 946, 950 (1993) (citations omitted).

We begin by examining the express language of the statute. The statute provides in pertinent part: "[a] person may not intentionally ... threaten to harm another ... with the intent of retaliating against a victim or witness...." The statute does not include a definition of "threaten" or "threat." Therefore, we look to its plain meaning. Black's Law Dictionary defines "threat" as "a communicated intent to inflict harm or loss on another or on another's property, esp[ecially] one that might diminish a person's freedom to act voluntarily or with lawful consent." *Black's Law Dictionary* 1519 (8th ed. 2004). In addition, Webster's Dictionary defines "threat" as "[a]n expression of an intention to inflict something harmful[;]" and "threaten" as "to express a threat against[;] to serve as a threat to[;] to give signs or warning of[;] to announce as possible." *Webster's II New College Dictionary* 1176 (3d ed. 2005). None of these definitions indicate who must hear the statement or to whom the statement must be directed in order for an expression to fall within the definition of "threat," so long as the statement or expression evidences an intent to inflict harm.

This Court addressed the definition of "threat" in the context of a threat to commit arson, proscribed by Md.Crim. Law Art. § 6–107, in *Moosavi v. State*, 355 Md. 651, 736 A.2d 285 (1999). In that case, an angry bank customer told a bank customer service representative by telephone that he was "going to blow up the bank." The Court defined "threat" as "a 'communicated intent to inflict' harm" and concluded that the defendant's statement, "I'm going to blow up the bank," "suggests an intention or desire to inflict harm, *i.e.*, a threat." 355 Md. at 664–65, 736 A.2d at 292 (citing *Black's Law Dictionary* 1480 (6th ed. 1990)). In another context, the Court of Special Appeals has defined "threat" as "an expression of a determination or intent to injure presently or in the future." *Abbott v. State*, 190 Md.App. 595, 619, 989 A.2d 795, 809 (2010) (citations and quotations omitted) (discussing whether the defendant's email to Governor O'Malley sent via the Office of the Governor's website constituted a "true threat" and a violation of Md.Crim. Law Art. § 3–708(b), threatening a state official). It is also noteworthy that the Court of Special Appeals, in construing what is a "threat" in *Abbott*, stated that a "statement may be a threat even if it was never communicated to the intended recipient." 190 Md.App. at 621, 989 A.2d at 810.

Although this Court has not had prior occasion to construe this portion of § 9–303, the Court of Special Appeals addressed the interpretation of this statute in *Parker v. State*, 189 Md.App. 474, 985 A.2d 72 (2009). Discussing the constitutionality of § 9–303(a), the intermediate appellate court noted that "the statute . . . is sufficiently clear that there is no need to look beyond its language to understand its meaning. . . . The words 'threaten to harm' are unambiguous . . . . [a]nd the operative phrase 'threaten to harm another' has a common and generally accepted meaning." *Parker*, 189 Md.App. at 484–85, 985 A.2d at 78 (citation and quotation omitted). The retaliatory threat at issue in *Parker* was communicated directly to the witness, but conveyed an intent to harm the witness's family rather than the witness himself. In that case, the defendant and the mother of defendant's child were arrested on drug charges and tried separately. After the mother's trial, the

defendant approached the detective, who had testified against the mother, directly outside the courthouse and stated, "[n]ow that you fucked with my family, I'll be fucking with yours." *Parker*, 189 Md.App. at 479, 985 A.2d at 75. The Court of Special Appeals held that a person of ordinary intelligence would know that the statement threatening the family of the witness "would be viewed as conduct threatening harm in retaliation for the witness's participation in the proceeding" and therefore the statute is constitutional. *Parker*, 189 Md. App. at 485, 985 A.2d at 78. Additionally, in discussing the defendant's challenge as to sufficiency of the evidence, the intermediate appellate court determined that the statute only requires proof of (1) an intentional threat of harm to another, and (2) that defendant made the threat with the intent to retaliate against a witness. *Parker*, 189 Md.App. at 486–87, 985 A.2d at 79. Finally, the court concluded that

> the statute does not require a threat of *physical* harm. . . . Nor does the statute require proof that the party making the threat had an actual intent to commit the harm to another. The critical element is the threat of harm, intentionally communicated to the witness for the purpose of retaliating against the witness.

*Parker*, 189 Md.App. at 487, 985 A.2d at 79 (emphasis in original). The parties in this case dispute the meaning of this last sentence, regarding the "critical element."

Petitioner argues that *Parker* stands for the proposition that the "critical element [of § 9–303(a) ] is the threat of harm, intentionally communicated to the witness for the purpose of retaliat[ion]." 189 Md.App. at 487, 985 A.2d at 79. Respondent asserts that Petitioner misreads *Parker*, and that *Parker* does not require that the threat be made directly to or heard by the witness, but rather the facts in that case involved a threat of harm to the witness's family made directly to the witness. We agree with Respondent. The Court of Special Appeals expressly stated the elements of the crime as they are found in the statute, namely, an intentional threat of harm to another and the intent to retaliate against a witness. Requiring communication to a witness would constitute an additional

element which is not present in the statute. Just as the Court
of Special Appeals refused to read a requirement of proof of
intent to commit the harm into the statute, the court did not
read an additional communication requirement into the stat-
ute, but merely applied the statute to the facts of that case.

Thus, the plain meaning of the statute does not contain a
requirement of actual communication of the threat to the
witness or victim, or with the belief that the threat would be
communicated to the witness or victim. In addition, neither
dictionary definitions of "threat" and "threaten," nor prior
definitions of "threat" adopted by this Court indicate that the
"expression" must be directed at or heard by a particular
recipient. Therefore, we will not "add[ ] . . . words in order to
give it a meaning not otherwise evident by the words actually
used" or otherwise read such a limitation into the statute.
*Harris,* 331 Md. at 145, 626 A.2d at 950.

We next look to the legislative history of § 9–303(a).
Even if the plain meaning is clear and unambiguous, we often
look to legislative intent and purpose to determine if they
ratify our analysis and interpretation of a statute. "In other
words, the resort to legislative history is a confirmatory
process; it is not undertaken to contradict the plain meaning
of the statute." *Mayor of Baltimore v. Chase,* 360 Md. 121,
131, 756 A.2d 987, 993 (2000). Section 9–303 was originally
enacted in 1993, along with Md.Crim. Law Art. § 9–302, which
prohibits witness intimidation. Senate Bill (S.B.) 261, ch. 223
Acts of 1993. This Court previously addressed the purpose
and history of the original statute in *Tracy v. State,* 423 Md. 1,
31 A.3d 160 (2011). In that case, we quoted from the legisla-
tive history the testimony of Hon. Alexander Williams, then
State's Attorney for Prince George's County (now a federal
district court judge), in favor of the bill. He testified:

> [W]e continue to see an increased hesitancy on the part of
> witnesses to testify about what they saw. . . . SB–261 grew
> out of discussions in my office about how to deal with this
> threat to our criminal justice system. . . . This bill attacks
> the problem in a number of ways . . . SB–261 creates four
> new crimes which prohibit bribing witnesses and assaulting

or threatening to assault witnesses or victims. These new crimes and the harsh penalties attached to them, should provide increased deterrence.

423 Md. at 16–17, 31 A.3d at 169.

The parties before us agree that a primary purpose of the statute is to protect victims and witnesses against "real, immediate and growing threats specifically made to [witnesses] or their families." In reading this testimony, Petitioner contends that by including "threats" in a list along with bribes and assaults of victims or witnesses, *i.e.* actions which are directed at the victim or witness, the statute must be intended to apply to threats actually made to the victim or witness. On the other hand, Respondent asserts that because the statute was also primarily "enacted as a deterrent to prevent criminals from making threats and intimidating the public," the critical element is the defendant's act and intent with regard to the threat of harm, not the impact of the act on the victim.

The original language of § 9–303(a) as enacted in 1993, however, did not include threats. The phrase "threaten to harm" was added to § 9–303(a) by an amendment to the law in 2005. S.B. 122, ch. 461 Acts of 2005. This Court noted in *Tracy* that the 2005 amendment to § 9–303 "simply closed a loophole that had existed until that time by adding *threats* uttered in retaliation for giving testimony or reporting a crime to the proscription against *actual retaliation* against a victim or witness who has reported a crime or given testimony." 423 Md. at 22, 31 A.3d at 172 (emphasis in original). *Tracy* does not provide further guidance in this case, however, because the Court's analysis centered on a comparison of §§ 9–302 and 303, which amounts to drawing the difference between threatening someone *before* a witness or victim testifies or reports a crime to *prevent* the testimony (§ 9–302) and *after* a witness or victim testifies or reports a crime in *retaliation* for the testimony (§ 9–303).[7] 423 Md. at 19, 31 A.3d at 170.

---

7. In *Tracy,* the defendant sent a letter threatening a woman who had filed charges against the defendant's brother. The letter was sent

Looking thus to the legislative history of the 2005 amendment, the Revised Fiscal and Policy Note for S.B. 122 prepared by the Department of Legislative Services for the General Assembly is instructive. By way of introduction, it states that "[t]his bill expands, increases the possible seriousness of, and alters the penalties for the crimes of: (1) inducing false testimony or avoidance of a subpoena; (2) **retaliation for testimony;** and (3) intimidating or corrupting a juror." Dep't of Legislative Servs., Revised Fiscal and Policy Note, S.B. 122 at 1 (2005) (emphasis added). More importantly, the Fiscal and Policy Note provides the background for the bill, stating that:

Intimidation by drug dealers has been a top concern in Baltimore City, where a husband and wife and five children were killed in 2002 after their home was firebombed in retaliation for calls to police against local drug dealers. . . . In addition, a so-called "Stop Snitching" DVD has been distributed in Baltimore.

*Id.* at 3. Additionally, a press release from the office of Governor Robert L. Ehrlich, who proposed the legislation in January 2005, called the proposal a "comprehensive plan to crack down on violent thugs who intimidate citizens who witnessed a crime." Press Release, Office of the Governor, Governor Ehrlich Announces Witness Intimidation Initiative (January 25, 2005). The impetus for the expansion of the prohibition and stricter penalties appears to be an extremely high rate of witness intimidation and violence. The press release notes that at that time:

In Baltimore City, homicide prosecutors estimate that witness intimidation occurs in 90% of their cases. In Baltimore County, a 17 year old who witnessed a gang murder and

---

before the case had gone to trial, *i.e.*, after the woman had reported the crime but before she had an opportunity to testify. The defendant was charged with violating both §§ 9–302 and 303. The Court held that the defendant was improperly charged with § 9–303 because the letter was not retaliatory, but rather was intended to impede future testimony, conduct which falls under § 9–302. *Tracy,* 423 Md. at 22, 31 A.3d at 172.

agreed to testify was shot in the back of the head by two friends of the murderer. On January 15, 2005, six men firebombed the home of a community activist in Baltimore as retaliation for the woman informing authorities about drug trafficking in her neighborhood.

*Id.* As noted by the parties, it is clear that this legislation was intended to protect victims and witnesses and to deter criminals from retaliating against those who report crimes or testify against the perpetrators. The addition of "threaten to harm" in the 2005 amendment to § 9–303(a) also indicates the legislature's intention that the statute be preemptive in nature. As is evident from the legislative history, the violence, particularly in Baltimore City, had escalated to such a point where both the public and the criminal justice system as a whole were threatened, and this amendment expanded the originally existing criminal statute to help protect victims and witnesses.[8] Thus, it does not appear that the legislature intended the statute to cover only threats made directly to a witness in retaliation for testimony.

Moreover, this Court can conceive of instances where a defendant may make indirect threats to a victim or witness without actually communicating the threat to the victim or witness. For example, in instances of domestic violence, a victim often has a protective order against a defendant. Nevertheless, a defendant could make threats of harm to a family

---

**8.** One particularly prominent case of violence that spurred renewed public discussions about witness intimidation and retaliation was the October 2002 firebombing of the Baltimore home of Angela Dawson in retaliation for reporting drug crimes to police, which killed Dawson, her husband, and their five children. *See* Gay Gately, *Baltimore Struggles to Battle Witness Intimidation*, The Boston Globe, Feb. 12, 2005, at A3, *available at* http://www.boston.com/news/nation/articles/2005/02/12/baltimore_struggles_to_battle_witness_intimidation/?page=full. Then, in 2005, came the dissemination of the "Stop Snitchin' " DVD, which Hon. Patricia C. Jessamy, then State's Attorney for Baltimore City, distributed to Maryland legislators as proof of the serious problem of witness intimidation and retaliation currently ongoing particularly in Baltimore City, which she described as the city's "No. 1 public safety issue." *See* Julie Bykowicz, *Witness–Intimidation Victims Urge the Passage of Legislation*, The Baltimore Sun, Jan. 26, 2005, at 4B *available at* http://www.baltimoresun.com/bal-victims01260,0,2857686.story.

member or acquaintance of the victim or witness, without regard as to whether the threat is subsequently communicated to the victim. Alternatively, a defendant could make a statement to a fellow detainee threatening harm to a victim or witness, as in this case. Such indirect threats are no less infused with the potential for follow through on the utterer's part than direct threats.

In addition to the plain meaning and legislative history of the statute, this Court may look to statutory structure to further enhance our understanding of the legislative intent. As we have explained, "we analyze the statutory scheme as a whole and attempt to harmonize provisions dealing with the same subject so that each may be given effect." *Briggs,* 413 Md. at 275–76, 992 A.2d at 440 (quoting *Kushell v. Dep't of Natural Res.,* 385 Md. 563, 577, 870 A.2d 186, 193 (2005)). Petitioner urges us to harmonize § 9–303(a) with both § 9–303(b) and § 9–302. Section 9–303(b) prohibits the solicitation of harm or threats of harm in retaliation for witness testimony. Subsection (b) uses language identical to the language in subsection (a), providing in pertinent part that "[a] person may not solicit another person to ... threaten to harm another ... with the intent of retaliating against a victim or witness...." Petitioner argues that it would be "illogical" to read "threaten to harm" as not requiring communication to the witness or victim in the context of soliciting someone to make a threat. Again, however, this Court can conceive of instances where a defendant—if confined in prison, for example—may solicit someone to threaten individuals, whether related to the victim or not, in retaliation for testimony or reporting a crime.

Section 9–302(a) prohibits the inducement of false testimony or avoidance of a subpoena, generally referred to as witness intimidation or witness tampering. That section provides in relevant part that "[a] person may not ... threaten to harm another ... with the intent to: (1) influence a victim or witness to testify falsely or withhold testimony; or (2) induce a victim or witness: ... (iii) not to report the existence of

facts relating to a crime or delinquent act." Petitioner asserts that it would be illogical to read "threaten to harm" as used in § 9–302 as applying to any threat regardless of to whom it is made, because in order to induce or influence a witness, the witness must be aware of the threat. Because the language regarding threats in § 9–303(a) parallels § 9–302(a), Petitioner argues, "threaten to harm" in should be construed the same way in each section. This argument is unpersuasive, however, because, as this Court concluded in *Tracy*, §§ 9–303 and 9–302 govern two different kinds of conduct with distinct timing aspects, that is, witness intimidation occurs *prior* to testimony whereas witness retaliation occurs *after* the testimony. 423 Md. at 19, 31 A.3d at 170. Moreover, neither statute requires proof of direct conveyance of a threat to the victim. Although the construction of § 9–302 is not before us, we note for sake of comparison that showing the impact of a threat on a victim would be a valuable method of proving intent to influence a victim or witness, but that does not mean that it is an element of the crime.[9]

Turning to the case before us, the conduct and statements at issue occurred just after Petitioner's trial and sentencing for assault charges filed by Ms. Wilgis, his girlfriend at the time. Although Ms. Wilgis did not testify as a witness during the trial, she did give a victim impact statement during sentencing, in which she explained the financial hardship

---

9. In support of his argument, Petitioner cites to a Florida intermediate appellate court case, which noted that, as compared to retaliation, "[l]ogically, witness tampering requires that the threat be made known to the witness in order to influence the witness's testimony." *State v. Jones*, 642 So.2d 804, 806 n. 3 (Fla.App. 5 Dist.1994) (holding that Florida's witness retaliation statute does not require intent to communicate threat to the witness). In Florida, like Maryland, there is one statute covering witness tampering and a separate statute covering retaliation against witnesses. Although there are differences in the language of the two Florida statutes governing witness tampering and retaliation, which Petitioner would contrast with the similarly styled language in §§ 9–303 and 302, the Florida court also noted that "[t]his conclusion is strengthened by the fact that the legislature separately addressed the problems of tampering and retaliation when it enacted these statutes." *Id.*

caused by Petitioner and stated that "I just want to be left alone." After the trial, Deputy Wilson escorted Petitioner from the courtroom back to the lockup. Deputy Wilson testified at the probation revocation hearing that while walking down the hall, Petitioner "was talking out loud and he made several comments" in a tone "louder than normal . . . . just loud." Specifically, Petitioner stated: "She don't know it, but she just signed her death warrant" and "She's going to be one sorry bitch in a year and a half." [10] In addition, Petitioner repeated these statements to other detainees when he returned to lockup. Deputy Wilson subsequently reported these statements to the State's Attorney's Office.

At the probation revocation proceeding, the trial court found these statements to be threatening and made in retaliation for Ms. Wilgis's victim impact statement. The trial court disagreed that *Parker* stands for the proposition that a threatening statement must be directed toward a particular person, and concluded that Petitioner had violated § 9–303(a) by making threatening statements with the intent to retaliate against Ms. Wilgis. The Court of Special Appeals affirmed, holding that the "essential elements" of retaliation under § 9–303(a) were established, and that the statute does not specifically require threats be made directly to the witness or victim, or with the belief that they would be communicated to the witness or victim.

We agree, and conclude first, that the statements, "[s]he don't know it, but she just signed her death warrant" and "[s]he's going to be one sorry bitch in a year and a half," constituted a "communicated intent to inflict harm," *Moosavi*, 355 Md. at 664, 736 A.2d at 292, and, therefore, a "threat" for the purposes of § 9–303(a). Secondly, a trier of fact could reasonably conclude that when Petitioner made these statements immediately after the sentencing, he intended to retali-

---

10. Although at oral argument the Court questioned whether these statements were directed at the female victim or at the female trial judge, counsel for Petitioner concedes that the threat was directed toward the victim, not the trial judge.

ate against Ms. Wilgis for giving a victim impact statement. The elements of the offense are (1) an intentional threat to harm another person, (2) made with the intent of retaliating against a victim or witness. The statute includes no requirement that the threat be directly communicated to the victim or witness, or conveyed with the belief that the threat would be communicated to the victim or witness. Therefore, we conclude that no such requirement exists. Both elements of the crime were complete when Petitioner made the statements, "[s]he don't know it, but she just signed her death warrant" and "[s]he's going to be one sorry bitch in a year and a half," immediately following the trial and sentencing at which Ms. Wilgis gave a victim impact statement.

## V. Revocation of Probation

This Court has long held that "[a] decision [to revoke probation] based in whole or in part on improper grounds cannot stand." *Smith v. State*, 306 Md. 1, 7, 11, 506 A.2d 1165, 1168, 1170 (1986); *see Baynard v. State*, 318 Md. 531, 536, 569 A.2d 652, 655 (1990) ("When it revoked probation, the circuit court relied on Baynard's purported violation of both conditions. If either ground was not sufficiently established, the order of revocation cannot stand."); *Dean v. State*, 291 Md. 198, 203, 434 A.2d 552, 555 (1981) (holding that partially relying on a kidnapping conviction that had since been reversed to uphold a revocation of probation was error). In the present case, the trial judge, in her position as presiding judge over Petitioner's probation revocation hearing, found that "Hammonds was in contempt by his purposely and in this Court's observation agitated manner ripping up [his copy of the probation papers], and that the threats he made this Court finds were made directed at the witness in this case . . . . *so for all those reasons* I'm invoking [sic] the probation and imposing the original sentence which is ten years." (Emphasis added.) The judge clearly relied on both grounds to revoke Petitioner's probation, one of which this Court has concluded was not sufficiently supported by the record.

In a case similar to the one at bar, a probationer was originally found to have violated two conditions of her probation: that she not consume alcohol and that she not cause any trouble by disturbing the peace, resisting arrest, or committing disorderly conduct. *Baynard*, 318 Md. at 536, 569 A.2d at 654. This Court later concluded that there was insufficient evidence to support a finding that the probationer violated the condition that she not act disorderly, and because of that, held that "the order of revocation cannot stand." *Baynard*, 318 Md. at 536, 569 A.2d at 655. Because a "[v]iolation of a condition of probation does not necessarily mandate imposition of the suspended sentence[,]" *Baynard*, 318 Md. at 540, 569 A.2d at 656, it would be error to affirm the Circuit Court's original decision to revoke Petitioner's probation. Therefore, we hold that there is insufficient evidence in the record to support a finding that Petitioner committed direct criminal contempt of court, and as such, the judgment of the intermediate appellate court must be reversed and the case remanded for further proceedings regarding whether the trial court would revoke Petitioner's probation solely for his violation of § 9–303(a) which, in and of itself, could be a violation of the "obey all laws" condition of probation.

**JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED IN PART AND REVERSED IN PART. CASE REMANDED TO THAT COURT WITH DIRECTIONS TO VACATE THE JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE COUNTY AND TO REMAND TO THAT COURT FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION. COSTS IN THIS COURT AND THE COURT OF SPECIAL APPEALS TO BE PAID BY BALTIMORE COUNTY.**

WATTS, J., concurs.

WATTS, J., concurring.

I respectfully concur:

I fully join this Court's analysis in Part IV ("Retaliation"). As to Part III ("Contempt"), although I agree with this

Court's conclusion that the circuit court judge abused her discretion at the hearing on revocation of probation, I respectfully disagree with the conclusion that the record does not suffice to support a finding that Petitioner committed direct criminal contempt of court.

The record is sufficient to support a finding that Petitioner committed direct criminal contempt of court. Deputy Wilson testified that he saw Petitioner tear up his copy of the probation papers immediately after receiving them. The circuit court judge saw Petitioner do so purposely and in an agitated manner. On this record, a finding could be made that Petitioner's act was conspicuous enough to interrupt the order of the court. Stated otherwise, the circuit court would not have abused its discretion in finding that Petitioner interfered with the dignified conduct of the court's business by expressing disrespect towards the circuit court judge's authority. A defendant commits direct criminal contempt of court where the defendant "interrupt[s] the order of the court and interfere[s] with the dignified conduct of the court's business[,]" Md. R. 15–203(a), by physically expressing disrespect towards the trial judge—even if the defendant's physical expression of disrespect towards the trial judge does not stop the proceedings. *See Mitchell v. State*, 320 Md. 756, 758, 765, 763, 580 A.2d 196, 197, 201, 199 (1990) (This Court held that a defendant committed direct criminal contempt of court where the defendant raised his middle finger at the trial judge; this Court stated: "In order to constitute a direct contempt, it is not necessary that the conduct bring to a halt the proceedings in progress."). It was within the circuit court judge's discretion to conclude that Petitioner's act was contemptuous, yet forego summarily sanctioning Petitioner under Rule 15–203(a).

The circuit court's failure to separately sanction Petitioner—either summarily (under Rule 15–203(a)) or in writing (under Rule 15–204)—did not preclude the circuit court from revoking Petitioner's probation based on the contempt. To revoke probation for failure to obey all laws, a trial court must find by a preponderance of the evidence that the probationer committed a crime sometime after the probationer's sentenc-

ing, but before the conclusion of probation. *See Gibson v. State*, 328 Md. 687, 690, 616 A.2d 877, 879 (1992). The probationer need not be convicted of or sentenced for the crime for the crime to serve as the basis for the revocation of probation. *See generally id.* at 693, 616 A.2d at 880 (This Court held that an acquittal of a certain crime does not estop the State from seeking revocation of probation.).

I am unpersuaded by Petitioner's contention that the circuit court could not revoke his probation for failure to obey all laws because direct criminal contempt is not a statutory crime. "[C]riminal contempt is a crime in every fundamental respect[.]" *Dorsey v. State*, 356 Md. 324, 342, 739 A.2d 41, 51 (1999) (citation and internal quotation marks omitted). A trial court's power to sanction parties for contempt stems from the common law. *See King v. State*, 400 Md. 419, 431, 929 A.2d 169, 176 (2007). In Maryland, there are a variety of common law crimes, *see, e.g., Grill v. State*, 337 Md. 91, 94, 651 A.2d 856, 857 (1995), for which a trial court may revoke a person's probation.

Nonetheless, I agree with this Court's conclusion that the circuit court judge abused her discretion at the hearing on revocation of probation. At the hearing, the circuit court judge stated that she had seen Petitioner tearing up his copy of the probation papers purposely and in an agitated manner in the back of the courtroom. Thus, at the hearing, the circuit court judge acted as both a witness and a judge. Although a trial judge may act as both a witness and a judge in finding that a defendant committed direct criminal contempt of court, *see* Md. R. 15–203(a), a trial judge cannot act as both a witness and a judge at a hearing on revocation of probation. *See* Md. R. 5–605 ("The judge presiding at the trial may not testify in that trial as a witness."); Md.Code of Judicial Conduct R. 2.11(a)(1) ("A judge shall disqualify himself or herself in any proceeding in which the judge's impartiality might reasonably be questioned, including [where t]he judge has ... personal knowledge of facts that are in dispute in the proceeding."); *Strickland v. State*, 407 Md. 344, 363, 965 A.2d 887, 897 (2009) ("[U]nder both Maryland Rule 5–605 and [Rule 2.11(a)(1) of

the Maryland Code of Judicial Conduct], the sentencing judge could not be both witness and decision maker." (Footnote omitted)). To avoid this conflict of interest, the circuit court judge should have recused herself from the hearing on revocation of probation. This would have allowed the hearing on revocation of probation to be assigned to a different judge, before whom the instant circuit court judge could have testified as to: (1) Petitioner tearing up his copy of the probation papers in the back of the courtroom; and (2) the manner in which Petitioner did so.[1]

For two reasons, it was problematic that the circuit court judge essentially acted as a witness for the State by stating that she had seen Petitioner tearing up his copy of the probation papers. First, presumably, the circuit court judge was not identified as a witness for the State in any notice to Petitioner of the hearing on revocation of probation. As to revocation of probation, generally, a "probationer is entitled to . . . disclosure of the evidence against" the probationer. *Adkins v. State*, 324 Md. 641, 655 n. 8, 598 A.2d 194, 201 n. 8 (1991) (citation omitted). Second, presumably, the circuit court judge was not subject to cross-examination by Petitioner. Generally, a probationer is "entitled to cross-examine adverse witnesses" at a hearing on revocation of probation. *Id.* at 655 n. 8, 598 A.2d at 201 n. 8 (citation omitted).

For the above reasons, I agree with this Court's conclusion that the circuit court judge abused her discretion.

---

1. I distinguish *Mitchell*, 320 Md. at 765, 580 A.2d at 200–01, in which this Court held that, without recusing himself, the trial judge could find that the defendant committed direct criminal contempt of court. In *Mitchell*, *id.* at 758, 580 A.2d at 197, the contempt occurred immediately after the trial judge sentenced the defendant for other crimes, and the trial judge separately sentenced the defendant for contempt. In other words, the trial judge acted as both a witness and a judge **only** in finding that the defendant committed direct criminal contempt of court. By contrast, here, the circuit court judge did not just act as both a witness and a judge in finding that Petitioner committed direct criminal contempt of court; the circuit court judge also acted as both a witness and a judge at the hearing on revocation of probation.